Michael J. Niborski (State Bar No. 192111)
*mniborski@pryorcashman.com*
**PRYOR CASHMAN LLP**
1801 Century Park East, 24th Floor
Los Angeles, California 90067-2302
Tel: (310) 683-6616
Fax: (310) 943-3397

Tom J. Ferber (Admitted PRO HAC VICE)
*tferber@pryorcashman.com*
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036-6569
Tel: (212) 421-4100
Fax: (212) 326-0806

*Attorneys for Defendant*
NETFLIX, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOSSACK FONSECA AND CO., S.A., et al., <br><br> Plaintiffs, <br><br> vs. <br><br> NETFLIX, INC., <br><br> Defendant. | Case No. 2:19-cv-09930-CBM-AS <br><br> **DEFENDANT NETFLIX INC.'S NOTICE OF SPECIAL MOTION TO STRIKE AND SPECIAL MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT UNDER THE CALIFORNIA ANTI-SLAPP STATUTE** <br><br> [Declarations of Jake Bernstein, Scott Z. Burns, Collin Creighton, and Tom J. Ferber and Notice of Lodging Physical Exhibits filed concurrently] <br><br> Hearing: <br> Date:  July 28, 2020 <br> Time:  10:00 a.m. <br> Place:  Courtroom 8B |

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on July 28, 2020 at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Consuelo B. Marshall of the above-entitled Court, located at 350 West First Street, Los Angeles, California, 90012, Courtroom 8B, Defendant Netflix, Inc. ("Netflix") will, and hereby does, move (the "Motion") to strike the state law claims asserted against Netflix in the January 21, 2020 Second Amended Complaint (the "SAC") [Docket No. 52] of Plaintiffs Mossack Fonseca & Co., S.A., Bufete MF & Co., Jurgen Mossack, and Ramon Fonseca ("Plaintiffs") pursuant to California's anti-SLAPP statute, California Code of Civil Procedure Section 425.16 ("Section 425.16").

The Motion is made on the grounds that: (1) the state law causes of action asserted against Netflix in the SAC—for libel and false light—arise from Netflix's protected speech and conduct; and (2) Plaintiffs cannot establish a probability of prevailing on the merits of their claims. In addition, Netflix requests that they recover from Plaintiffs their attorneys' fees and costs incurred in making this Motion as required by Section 425.16(c).[1]

This Motion is based upon this Notice of Special Motion and Special Motion to Strike, the accompanying Memorandum of Points and Authorities, the accompanying Declarations and the exhibits annexed thereto, the pleadings and papers on file herein, all other matters of which the Court may take judicial notice, and such other or further material as may be presented at or before the hearing on the Motion.

---

[1] If the Court grants this Motion, Netflix will prove the amount of their attorneys' fees and costs separately. Section 425.16(c) mandates that a prevailing defendant "shall" recover attorneys' fees and costs and, if this Motion is granted, Netflix separately will prove the amount of their attorneys' fees and costs incurred in making this Motion. *See US Ex Rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999), subsequently amended by *US Ex Rel. Newsham v. Lockheed Missiles & Space Co.*, 99 D.A.R. 9497 (9th Cir. 1999) (holding that the Section 425.16(c) fee-shifting requirement applies in federal court).

1    This Motion is made following several conferences of counsel pursuant to

2    Local Rule 7-3 which took place beginning on February 10, 2020 and concluded on

3    March 11, 2020.

4

5

6                              **PRYOR CASHMAN LLP**

7

8    Dated: June 17, 2020          By:    */s/ Michael J. Niborski*

9                                          Michael J. Niborski
                                           *mniborski@pryorcashman.com*

10                                         Tom J. Ferber
                                           (Admitted PRO HAC VICE)

11                                         *tferber@pryorcashman.com*

12                                         *Attorneys for Defendant*
                                           NETFLIX, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

I.    INTRODUCTION .....................................................................................1

II.   STATEMENT OF FACTS ........................................................................2

A.    Plaintiffs' Business ..................................................................................2

B.    The Panama Papers ............................................................................3

C.    The Effect of The Panama Papers Scandal on Plaintiffs ..........................3

D.    Jake Bernstein's Book: *Secrecy World* ...............................................4

E.    The Laundromat ................................................................................5

F.    The Second Amended Complaint .........................................................6

III.  ARGUMENT.............................................................................................7

A.    Legal Standard For Anti-SLAPP Motions .........................................7

B.    The State Law Claims Arise from Protected Activity .................................8

C.    Plaintiffs Cannot Demonstrate a Reasonable Probability
      of Prevailing on the Merits of Their State Law Libel Claims....................10

      1.    The Film is not a false publication of fact concerning Plaintiffs .........10

      2.    The alleged injury to Plaintiffs' reputation has already occurred ........13

      3.    Plaintiffs are public figures and will be unable to prove actual
            malice by clear and convincing evidence...........................................13

            a.    Plaintiffs Are Public Figures.........................................................14

            b.    Plaintiffs Have Not Sufficiently Alleged and Cannot
                  Prove Actual Malice ..................................................................18

D.    Plaintiff Cannot Demonstrate a Reasonable Probability of Prevailing
      on the Merits of Their State Law False Light Claim .................................22

E.    Defendant Cannot Be Held Liable for Commentary About the Film
      Authored and Published by Third Parties .................................................24

IV. CONCLUSION ..........................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                           <u>PAGE(s)</u>

*Aisenson v. Am. Broad. Co.*,
  220 Cal. App. 3d 146 (1990) ...........................................................23

*Ampex Corp. v. Cargle*,
  128 Cal. App. 4th 1569 (2005) ..................................................14, 15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................18

*Baral v. Schnitt*,
  1 Cal. 5th 376 (2016)........................................................................8

*Beilenson v. Superior Court*,
  44 Cal. App. 4th 944 (1996) ...........................................................19

*Bose Corp. v. Consumers Union*,
  466 U.S. 485 (1984) .......................................................................18

*Brahmana v. Lembo*,
  2010 WL 965296 (N.D. Cal. Mar. 17, 2010) ..................................23

*Braun v. Chronicle Publ'g*,
  52 Cal. App. 4th 1036 (1997) ...........................................................7

*Brodeur v. Atlas Entm't, Inc.*,
  248 Cal. App. 4th 665 (2016) ...................................................11, 21

*Damon v. Ocean Hills Journalism Club*,
  85 Cal. App. 4th 468 (2000) .............................................................8

*Davis v. Costa-Gavras*,
  654 F. Supp. 653 (S.D.N.Y. 1987).............................................11, 20

*De Havilland v. FX Networks, LLC*,
  21 Cal. App. 5th 845, 854 (2018), *review denied* (July 11, 2018),
  *cert. denied*, 139 S. Ct. 800 (2019) ...........................................*passim*

**CASES**                                                           **PAGE(s)**

*Du Charme v. International Broth. Of Elec. Workers, Local 45,*

    110 Cal. App. 4th 107 (2003) .................................................................9

*Eastwood v. Nat'l Enquirer, Inc.,*

    123 F.3d 1249 (9th Cir. 1997) ...........................................................24

*Eisenberg v. Alameda Newspapers, Inc.,*

    74 Cal. App. 4th 1359 (1999) ............................................................22

*Fellows v. Nat'l Enquirer, Inc.,*

    42 Cal. 3d 234 (1986)........................................................................23

*Garrison v. Louisiana,*

    379 U.S. 64 (1964) ............................................................................18

*Gertz v. Robert Welch, Inc.,*

    418 U.S. 323 (1974) ...........................................................13, 14, 16

*Gilbert v. Sykes,*

    147 Cal. App. 4th 13 (2007) ..............................................10, 12, 17

*Good Government Group of Seal Beach, Inc. v. Superior Court of L.A. Cty.,*

    22 Cal. 3d 672 (1978).......................................................................21

*Harte-Hanks Commc'ns v. Connaughton,*

    491 U.S. 657 (1989) ..........................................................................18

*Heller v. NBCUniversal, Inc.,*

    2016 WL 6573985 (C.D. Cal. Mar. 30, 2016) ..................................17

*Herbert v. Lando,*

    781 F.2d 298 (2d Cir. 1986) ..............................................................18

*Hu & Assocs., LLC v. New Life Senior Wellness Ctr., LLC,*

    2017 WL 10591754 (C.D. Cal. July 7, 2017) .............................16, 17

*Jankovic v. Int'l Crisis Grp.,*

    822 F.3d 576 (D.C. Cir. 2016).............................................................14

**CASES**                                                              **PAGE(s)**

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ...................................................................2

*Kashian v. Harriman*,
98 Cal. App. 4th 892 (2002) ......................................................8

*Makaeff v. Trump Univ., LLC*,
715 F.3d 254 (9th Cir. 2013) ...................................... 14, 15, 16, 17

*Manzari v. Associated Newspapers Ltd.*,
830 F.3d 881 (9th Cir. 2016) ...................................................22

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ...........................................................11, 18

*Matson v. Dvorak*,
40 Cal. App. 4th 539 (1995) ...............................................24, 25

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996) .................................................18

*Metabolife Int'l, Inc. v. Wornick*,
264 F.3d 832 (9th Cir. 2001) .....................................................8

*Mosesian v. McClatchy Newspapers*,
233 Cal. App. 3d 1685 (1991) ..................................................15

*Navellier v. Sletten*,
29 Cal. 4th 82 (2002)..................................................................8

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ..................................................................18

*Nygard, Inc. v. Uusi-Kerttula*,
159 Cal. App. 4th 1027 (2008) ...............................................8, 9

*Ostella v. Taitz*,
2018 WL 6190598 (C.D. Cal. Oct. 5, 2018), *aff'd*, -- Fed. App'x --,
2020 WL 1818607 (9th Cir. 2020) ............................................22

**CASES**                                                                     **PAGE(s)**

*Partington v. Bugliosi,*

   56 F.3d 1147 (9th Cir. 1995) ...................................................................*passim*

*Reader's Digest Assn. v. Superior Court,*

   37 Cal. 3d 244 (1984)......................................................................14

*Resolute Forest Prods., Inc. v. Greenpeace Int'l,*

   302 F. Supp. 3d 1005 (N.D. Cal. 2017) ..............................................17

*Rivero v. Am. Fed'n of State, County, & Mun. Employees, AFL–CIO,*

   105 Cal. App. 4th 913 (2003) ..............................................................9

*Robertson v. Rodriguez,*

   36 Cal. App. 4th 347 (1995) ..............................................................10

*Sarver v. Chartier,*

   813 F.3d 891 (9th Cir. 2016) ........................................... 8, 9, 10, 23

*Silva v. Hearst Corp.,*

   1997 WL 33798080 (C.D. Cal. Aug. 22, 1997) ................................23

*Solano v. Playgirl, Inc.,*

   292 F.3d 1078 (9th Cir. 2002) ..................................................22, 23

*St. Amant v. Thompson,*

   390 U.S. 727 (1968) .........................................................................18

*Street v. Nat'l Broad. Co.,*

   645 F.2d 1227 (6th Cir. 1981) ..........................................................20

*Unsworth v. Musk,*

   2019 WL 8220721 (C.D. Cal. Nov. 18, 2019) ................................ 14, 15, 16, 17

*US Ex Rel. Newsham v. Lockheed Missiles & Space Co.,*

   190 F.3d 963 (9th Cir. 1999), subsequently amended by *US Ex Rel.*

   *Newsham v. Lockheed Missiles & Space Co.*, 99 D.A.R. 9497 (9th Cir. 1999)....1

*Vess v. Ciba-Geigy Corp. USA,*

   317 F.3d 1097 (9th Cir. 2003) ............................................................7

**CASES**                                                                                                           **PAGE(s)**

*Waldbaum v. Fairchild Publn's, Inc.*,

 627 F.2d 1287 (D.C. Cir. 1980) ............................................................ 15, 16, 17

**STATUTES**

Cal. Civ. Proc. Code § 425.16....................................................................1, 7

Cal. Civ. Proc. Code § 425.16(a) ...................................................................7

Cal. Civ. Proc. Code § 425.16(b)(1)...........................................................7, 10

Cal. Civ. Proc. Code § 425.16(c) ...................................................................1

Cal. Civ. Proc. Code § 425.16(e) ...................................................................8

Cal. Civ. Proc. Code § 425.16(e)(3)................................................................8

Cal. Civ. Proc. Code § 425.16(e)(4)............................................................8, 9

**ARTICLE**

*https://www.nytimes.com/2019/09/25/movies/the-laundromat-*

 *review.html?searchResultPosition=1.* ..................................................2

Defendant Netflix, Inc. ("Netflix") respectfully submits this memorandum of law in support of its Special Motion to Strike Plaintiffs'[2] libel and false light invasion of privacy claims under the California Anti-SLAPP Statute.

## I.   INTRODUCTION

Plaintiffs were Panamanian attorneys and "well-known worldwide leaders" in the global offshore finance network until the 2016 release of the massive trove of documents hacked from their firm which became known as the "Panama Papers." They claim to have been defamed by the 2019 Netflix film *The Laundromat* (the "Film"), a satire about the abuse of the offshore industry by the rich and powerful that came to light in the wake of the Panama Papers' disclosure.

Notably, however, Plaintiffs admit that the harm they claim as a result of the Film actually occurred years earlier as a result of the media frenzy that followed the release of the Panama Papers. Their complaint acknowledges that their reputations had already been blackened as a result of the spotlight that the international press has been shining on them since 2016 – the result of which was the loss of all of their clients, banks refusing to do business with them and the shuttering of their business, as well as becoming the subjects of several criminal investigations and prosecutions. Moreover, Plaintiffs' allegation that the Film depicts them as being engaged in criminal activities is rebutted by the Film itself, which portrays others, but *not* them, as committing crimes.[3]

---

[2] The plaintiffs are Jürgen Mossack, Ramón Fonseca, Bufete MF & Co. and Mossack Fonseca & Co., S.A. (collectively "Plaintiffs").

[3] At the conclusion of the Film, where Plaintiffs' arrests are depicted, a law enforcement officer makes the true statement that Europol had found connections between some 3500 individuals with companies created by Plaintiff and suspected criminals. Given that Plaintiffs created over 200,000 offshore entities, this is consistent with Plaintiffs' admission that a small percentage of companies they created were utilized for "criminal activity including, but not limited to, money laundering, tax evasion, bribery and/or fraud." (Second Amended Complaint ("SAC") ¶ 53; *see also* Declaration of Jake Bernstein filed concurrently herewith ("Bernstein Decl.") at ¶ 14 and Ex. 1; Declaration of Scott Z. Burns ("Burns Decl.") at ¶ 16.)

The Film, which *The New York Times* described as "a didactic comedy, an earnest lesson in political economy dressed up as a farce,"[4] is a moral indictment of the "massive and pervasive corruption of the legal system" and the elite and powerful who have no incentive to stop tax evasion. As the U.S. Supreme Court long ago recognized: "The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). The Film is not calumny, but a social critique in the form of a morality tale. Plaintiffs' claims are an affront to the First Amendment. Not only are Plaintiffs' allegations that the Film harmed them patently baseless, but they are public figures who could not begin to meet the constitutional threshold for asserting such claims.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs' Business

Plaintiffs, attorneys who were licensed in Panama and their affiliated entities, were "in the business of forming and maintaining offshore companies," selling their "products" in "countries commonly referred to as 'tax havens.'" (SAC ¶¶ 22-24, 27-28.) Plaintiffs became "well-known worldwide leader[s]" in the offshore "industry" over 42 years, with representatives all over the globe. (*Id.* at ¶¶ 32, 34, 42.) These representatives of Plaintiffs were given "exclusive rights" to purchase and then sell Plaintiffs' products "in exchange for fees and/or specified commissions," which yielded "significant" profits to Plaintiffs. (*Id.* at ¶¶ 43, 46, 48.) Individual plaintiffs Jürgen Mossack ("Mossack") and Ramón Fonseca ("Fonseca") "enhance[d]" the "offshore industry" through participation in public forums, speaking engagements, and advising government officials. (*Id.* at ¶ 39.) Significantly, Plaintiffs acknowledge that some of the offshore corporations created by them were used "for criminal activity including, but not limited to, money laundering, tax evasion, bribery and/or fraud." (*Id.* at ¶ 53.)

---

[4] (*See* Declaration of Tom J. Ferber filed concurrently herewith ("Ferber Decl.") Ex. 3.)

B.    **The Panama Papers**

In April 2016, media outlets around the world began publishing reports regarding the methods used by the rich and powerful to hide income and avoid taxes through the use of offshore bank accounts and shell companies. (*Id.* at. ¶¶ 54-57.) The primary source for these bombshell reports was a cache of 11.5 million documents from Plaintiffs' files which an anonymous whistleblower had allegedly "hacked" and provided to journalist Bastian Obermayer ("Obermayer") of the German newspaper *Suddeutsche Zeitung*. (*Id.* at. ¶ 49). Obermayer enlisted the International Consortium of Investigative Journalists ("ICIJ"), which consisted of journalists from approximately 80 countries, who reviewed the massive corpus of documents for approximately one year before any reports regarding their contents were published. (*Id.* at. ¶¶ 51-52.) These documents, dubbed the "Panama Papers," referenced over 200,000 offshore entities created by Plaintiffs, including many used for the benefit of rich and famous people in both public and private sectors around the world. (*Id.* at ¶ 50.)

Since the release of the Panama Papers, Mossack and Fonseca have not hidden from the international controversy. Mossack gave interviews to CNBC and *The Wall Street Journal* in April 2016, and Fonseca gave an interview to reporters, excerpts of which were subsequently published in a Reuters article and an AP Article in February 2017.[5]  Mossack and Fonseca also spoke with investigative journalist Jake Bernstein ("Bernstein"), a senior reporter with ICIJ who was writing a book about the Panama Papers and the offshore industry. (SAC at ¶ 74.)[6]

C.    **The Effect of The Panama Papers Scandal on Plaintiffs**

As a result of the "revelations" in the Panama Papers, Plaintiffs "were rumored to have dealt directly with and/or advised, assisted or counseled heads of State and/or Government," as well as "notorious drug Cartel and/or other Organized Crime leaders" and others "on the subject matter of tax avoidance, tax evasion, money laundering, fraud

---

[5] (Ferber Decl. at ¶¶ 6-9, Exs. 4-7.)

[6] (*See also* Bernstein Decl. at ¶¶ 7-9.)

and/or other crimes." (*Id.* at ¶¶ 54-57.) Moreover, the reporting on the Panama Papers and the Plaintiffs' role in facilitating tax avoidance and offshore banking for the wealthy precipitated numerous governmental investigations and prosecutions, including two legal proceedings brought by Panamanian authorities against Mossack and Fonseca and an anticipated federal indictment in New York. (*Id.* at ¶¶ 9-10, 62, 144.)

"The press and media generated by the Panama Papers hack severely damaged [Plaintiffs'] client relations and ongoing business prospects," resulting in "banks and other third parties refus[ing]to do business" with Plaintiffs." (*Id.* ¶¶ 58-59.) "Plaintiffs all faced bank account closures and to date, all [Plaintiffs] remain unable to bank anywhere in the world," which "led to closure of [their] offices and ultimately the loss of [their] entire client base." (*Id.* ¶¶ 59-61, 64.)[7]  Moreover, the ongoing criminal investigations and prosecutions have left Mossack and Fonseca subject to arrest and bail conditions that confine them to Panama.  (*Id.* ¶¶ 62-63.)

### D.   Jake Bernstein's Book: *Secrecy World*

On November 21, 2017, Pulitzer Prize-winning investigative journalist Jake Bernstein published a book entitled *Secrecy World: Inside the Panama Papers Investigation of Illicit Money Networks and the Global Elite* (hereafter, the "Book").  (*Id.* at ¶ 67; Bernstein Decl. at ¶ 1.) "Bernstein thoroughly researched the nature and origin of the Panama Papers hack, and was part of the original team of ICIJ journalists who reviewed the same." (SAC at ¶ 68.) Bernstein had also "spoke[n] on occasion with Plaintiffs while he was working on the book. (Bernstein Decl. at ¶ 7.  Bernstein sent Mossack and Fonseca copies of the Book, for which they thanked him, and neither ever complained to him about anything in the 2017 Book. (Bernstein Decl. at ¶ 10.) Plaintiffs now allege for the first time, however, that the Book defames them (SAC at ¶ 75), although they still assert no legal claim against the Book itself.

---

[7] Plaintiffs closed their law firm in March 2018. (Ferber Decl. at ¶ 15, Ex. 13)

### E.   The Laundromat

Director Steven Soderbergh and screenwriter Scott Z. Burns ("Burns") teamed up with producers who optioned the film rights to the Book. Burns worked with Bernstein and also interviewed Fonseca and Mossack while he was working on his screenplay.[8] In the fall of 2019, two years after the Book was published, Netflix commenced distribution of the resulting film, *The Laundromat*. (SAC at ¶ 141.) The Film does not purport to be a factual documentary or non-fiction adaptation of the Book. From the Film's first scene, it is clearly not a dramatic presentation of actual facts, but rather a satirical morality tale[9] about a system which invites and protects abuse (Burns Decl. at ¶¶ 7, 15, 18.)

Moreover, while the Film has characters bearing Mossack and Fonseca's names, they are cartoonish narrators who explain how they came to be in the offshore industry and introduce vignettes dramatizing the abuses that the legal offshore system permits for tax avoidance and other illicit activity. (Burns Decl. ¶¶ 6-7.) The Film does not depict the these characters as direct participants in criminal activity.

These palpably farcical narrators open the Film dressed in tuxedoes on a barren landscape, carrying martinis as they walk past cavemen. They explain the genesis of money and credit with comedic dialogue about the impracticality of bartering bananas (which "turn brown over time") and cows (which "can wander away"). Noting that the world of finance has since "gotten a little more complicated," they then introduce the vignettes that follow as stories "that are not about us; they are more about you."[10]

---

[8] (*See* Burns Decl. at ¶¶4-5; Bernstein Decl. at ¶8.)

[9] The Film opens with a title card facetiously stating that the Film is "**Based On** Actual Secrets." (Ferber Decl. at ¶ 10, Ex. 8 (emphasis added)), and ends with a disclaimer at the 1:34:25 mark stating "While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue, and names are fictionalized for the purpose of dramatization. As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history." (Ferber Decl. ¶ 11, Ex. 9.)

[10] These vignettes, which concern *other* characters, are described in the accompanying Bernstein and Burns declarations. A DVD of the Film is submitted with this motion for the Court's viewing.

Later in the Film, the Mossack and Fonseca characters state that they don't even know the identities of all of their clients. After the vignettes of cheating and other illicit activity by *other* characters, the Mossack and Fonseca characters exclaim that the idea for the system of shell corporations and tax shelters came from the United States. In a satirical wink, they note that "the director of this movie has five [Delaware corporations]. Even our writer has one." And it's *legal* – it's called "tax avoidance."

The Film depicts the April 2016 hacking of the Panama Papers by "John Doe," and their subsequent worldwide publication. Plaintiffs' tax shelter and shell corporation mill is exposed. President Obama is seen saying that the problem is that most of it is *legal*. The narrators (*i.e.,* Mossack and Fonseca), who have made the same point, explain that they "didn't write the laws; [they] just wrote contracts!" They are ruined by the ensuing scandal, close their businesses, and are arrested because some of the shell entities they formed have been connected to suspected criminals. Sitting in jail (or what is revealed to be dramatic/comedic jail scenery), the Mossack character complains: "You want to go back to bananas?!" The Film ends with words from "John Doe's" so-called "manifesto," calling on governments around the world to end the pervasive corruption described in the Film.

### F.    The Second Amended Complaint

Plaintiffs claim that the Film, which was "based upon" the Book, and its trailer defame them and cast them in a false light. (SAC ¶¶ 81, 86, 93, 113-20.) They claim (for the first time) that the Book defamed them and conclusorily allege that Netflix knew that the Book was libelous, even though they never complained to Bernstein, who had sent them copies of the Book in appreciation for their help. (*Id*. ¶¶ 75, 97.) Plaintiffs allege that they are portrayed as "ruthless, uncaring and unethical lawyers involved in money laundering, tax evasion and/or other criminal activities that benefit wealthy people and/or dangerous criminals and they complain about the Film's "sub-plots." (*Id*. ¶ 100, 113-20, 160.) They claim, *inter alia*, that the Film has injured their "personal and professional

1    reputations" and that "clients have been deterred" from dealing with them. (*Id.* ¶¶ 147-

2    48.) They also allege that third-party reviews of the Film defame them. (*Id.* ¶¶ 128-39.)

3         At the same time, however, Plaintiffs allege that Bernstein, who was part of the

4    ICIJ team that reviewed the Panama Papers, "thoroughly researched" the Book, including

5    speaking with both Mossack and Fonseca. (*Id.* ¶¶ 67-68, 74.) The SAC is replete with

6    allegations that it was the revelations from the <u>2016</u> "hack and release" of the Panama

7    Papers that resulted in damaging rumors that destroyed Plaintiffs' reputation, including

8    that they had advised and dealt with people ranging from heads of state to drug cartel and

9    organized crime leaders on matters of "tax avoidance, tax evasion, money laundering,

10   fraud and /or other crimes." (*Id.* ¶¶ 54-57.) The SAC alleges that this coverage destroyed

11   their "client relations and ongoing business prospects," causing banks and others refusing

12   to do business with them, resulting in the loss of all of their clients and the closure of their

13   offices in 2018. (*Id.* ¶¶ 58-61.) Finally, Plaintiffs admit that a small percentage of the over

14   200,000 offshore entities that they created for their clients were, in fact, subsequently

15   utilized for criminal activity including money laundering, tax evasion, bribery and/or

16   fraud. (*Id.* ¶ 53.)

17   **III.   ARGUMENT**

18        **A.   Legal Standard For Anti-SLAPP Motions**

19        California enacted the anti-SLAPP statute "to nip … in the bud" meritless claims

20   targeting a defendant's exercise of his constitutional right to free speech. *Braun v.*

21   *Chronicle Publ'g*, 52 Cal. App. 4th 1036, 1042 (1997). Under the anti-SLAPP Statute,

22   any "cause of action against a person arising from any act of that person in furtherance of

23   the person's right of … free speech … in connection with a public issue shall be subject

24   to a special motion to strike, unless the court determines that the plaintiff has established

25   that there is a <u>probability</u> that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code

26   § 425.16(b)(1). By its express terms, the anti-SLAPP Statute is "shall be construed

27   broadly." *Id.* §425.16(a). Anti-SLAPP motions brought pursuant to Section 425.16 are

28   permissible in Federal Court. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109

(9th Cir. 2003).[11]

The threshold issue is whether "the challenged claim arises from activity protected by [S]ection 425.16." *Baral v. Schnitt*, 1 Cal. 5th 376, 384 (2016). There are four categories of protected activity enumerated in Section 425.16(e): including "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law…[and] (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

If the claim arises from protected activity, the claim must be struck if the plaintiff cannot demonstrate a probability of prevailing. *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002). To do so, a plaintiff must present admissible evidence to demonstrate a probability of success on the merits. *Kashian v. Harriman*, 98 Cal. App. 4th 892, 926-27 (2002).

## B.    The State Law Claims Arise from Protected Activity

Plaintiffs' state law claims for libel and false light are all based on elements displayed in the Film, which is protected by Netflix's constitutional right of free speech concerning an issue of public interest under Section 425.16(e)(3) and (e)(4). As such, it plainly qualifies as "protected activity" under the anti-SLAPP Statute.

First, the Film is considered a "public forum" under section 425.16(e)(3). *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1038 (2008) (citing *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 476-77 (2000)). A publication "need not be an <u>open</u> forum to be a <u>public</u> forum—it is enough that it can be purchased and read by members of the public." *Id.* at 1039. Films constitute "speech in a public forum,

---

[11] The statute's 60-day time frame does not apply in federal court. *See Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016) (holding anti-SLAPP motion filed almost a year after plaintiff's complaint to be timely); *see also Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).

involving an issue of public concern." *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 854 (2018), *review denied* (July 11, 2018), *cert. denied*, 139 S. Ct. 800 (2019).

Second, the Film obviously is an expression of Netflix's "constitutional right of free speech," providing an independent basis for applying the anti-SLAPP Statute to any purported libel claim arising from it. *See* Cal. Civ. Proc. Code § 425.16(e)(4).

Third, the Film clearly covers both a "public issue" and an "an issue of public interest." Courts use these two phrases interchangeably. *Du Charme v. International Broth. Of Elec. Workers, Local* 45, 110 Cal. App. 4th 107, 118 (2003). Although the precise boundaries of the phrase "public issue" have never been strictly defined, the most common definitions of the term focus on: (1) "a person or entity in the public eye," (2) "conduct that could directly affect a large number of people beyond the direct participants," and (3) "a topic of widespread, public interest." *Rivero v. Am. Fed'n of State, County, & Mun. Employees, AFL–CIO*, 105 Cal. App. 4th 913, 924 (2003) (discussing cases defining "public issue"). Moreover, the phrase "issue of public interest" is broadly construed by the courts to include "any issue in which the public is interested." *Nygard*, 159 Cal. App. 4th at 1042 (emphasis in original).

Simply put, it cannot seriously be argued that the Film—which addresses significant public issues regarding the offshore industry, which was abused for financial and criminal wrongdoing on a worldwide level—does not satisfy this standard. *See Sarver v. Chartier*, 813 F.3d 891, 902 (9th Cir. 2016) (holding that a film incorporating a person's personal characteristics constitutes an issue of public concern when those characteristics "are displayed only in the context" of the Iraq War, a "matter of significant and sustained public attention."). Plaintiffs' state law claims are subject to the anti-SLAPP statute.

**C.      Plaintiffs Cannot Demonstrate a Reasonable Probability of Prevailing on the Merits of Their State Law Libel Claims**

Because the claims against Netflix arise from constitutionally protected activity, the burden is on Plaintiffs to establish a probability of prevailing on those claims. *See* §425.16(b)(1); *Robertson v. Rodriguez*, 36 Cal. App. 4th 347, 355 (1995).

**1.      The Film is not a false publication of fact concerning Plaintiffs**

To defeat Defendant's anti-SLAPP motion, Plaintiffs must offer admissible evidence that "a reasonable viewer would interpret [the Film] as conveying (a) statements of fact that are (b) defamatory . . . to a reasonable person and (c) actually false . . ." *De Havilland*, 21 Cal. App. 5th at 965-66[12]; *see Sarver*, 813 F.3d at 906 ("Sarver must show that *The Hurt Locker* depicted him in a way that is 'provably false' . . .") (citation & quotations omitted). "Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot reasonably be interpreted as stating actual facts about an individual." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007) (citation & quotations omitted). Here, the Film does not convey a false statement of fact concerning Plaintiffs.[13]

First, reasonable viewers would not interpret the Film as offering a factual portrayal of Plaintiffs.  As the California Court of Appeal stated in *De Havilland*, "[v]iewers are generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined." 21 Cal. App. 5th at 866 (striking actress Olivia De Havilland's complaint based upon her portrayal in a fictionalized docudrama); *see Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) (finding that viewers of fictionalized fact-based films "would be sufficiently familiar with this genre to avoid assuming that all statements [therein]

---

[12] *De Havilland* analyzes a false light claim, but notes that it is "in substance equivalent to a libel claim, and should meet the same requirements of a libel claim. . ." *Id*. at 865 (citation & quotations omitted).

[13] As noted above, Plaintiffs are required to identify the specific statements they allege to be defamatory and may not simply allege the Film as a whole is defamatory.

represent assertions of verifiable facts. To the contrary, most [viewers] are aware by now that parts of such programs are more fiction than fact"). As the Supreme Court has recognized, viewers are able to distinguish between fictionalized portrayals, on the one hand, and literally true and accurate statements such as news reporting, on the other. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513 (1991).

Here, the Film explicitly states it is "*based on*"[14] real events, indicating that it is an obviously fictionalized story that falls squarely into the genre of fictionalized fact-based films, which courts have repeatedly held do not convey objective fact. *See Brodeur v. Atlas Entm't, Inc.,* 248 Cal. App. 4th 665, 680 (2016) (finding character's statement could not reasonably be perceived as conveying "assertions of objective fact" in part because "[t]he stage was set at the beginning of the film" by the statement "'Some of this actually happened,' . . . [which] sets the tone perfectly" (citation omitted)); *Davis v. Costa-Gavras*, 654 F. Supp. 653, 657 (S.D.N.Y. 1987) (citing disclaimer as evidence that "film does not purport to depict . . . the events precisely as they actually occurred"). In addition, the Film's palpably satirical, at times farcical, style further signals viewers not to interpret it as making strictly factual portrayals. *See Partington*, 56 F.3d at 1155 ("general tenor" of a work impacts whether it conveys "a false assertion of objective fact"); *Brodeur*, 248 Cal. App. 4th at 680 ("[W]e agree with defendants that Rosalyn's comment in the microwave oven scene . . . is not reasonably susceptible of a defamatory meaning. American Hustle is, after all, a farce."). The narrator characters Mossack and Fonseca, in particular, are portrayed in a palpably caricaturish manner, in keeping with the overall style and tenor of the Film. They open the Film with a farcical dialogue, as they walk past (and interact with) cavemen, explaining the genesis of financial system in terms of bartering bananas and cows. No reasonable viewer would take these characters' words or conduct literally. Rather, the viewer recognizes that the Film's satirical

---

[14] The trailer, which is repeatedly referenced in the Complaint (*see, e.g.*, SAC at ¶ 100) offers a tongue-in-cheek description of the Film as "Based on Some Real Shit." The Film itself similarly notes with a wink that its largely comedic presentation is "Based on Actual Secrets." (Ferber Decl. at ¶ 10, Ex. 8.)

presentation about a serious issue: the exploitation of an immoral financial system by the ultra-rich – through the means of offshore companies created by individuals like Plaintiffs – to the detriment of society.

Moreover, while the Film identifies Plaintiffs as central figures in the story it is telling, it does not portray them directly participating in the murders, drug cartels, and other criminal activity referenced in the Complaint.[15] Rather, it makes the point that much, if not all, of the offshore industry shell game M&F helped promote is *legal*, and its conclusion makes clear that it is an indictment of the system that enables such conduct.[16]

Second, to the extent that the Film portrays the Mossack and Fonseca characters as engaged in conduct that enables *others'* criminal activity, this portrayal meets the substantial truth standard set forth under California's defamation law. *See De Havilland*, 21 Cal. App. 5th at 868 ("California law permits the defense of substantial truth, and thus a defendant is not liable if the substance of the charge be proved true") (citation & quotations omitted); *Gilbert*, 147 Cal. App. 4th at 28 (a statement is not actionable as long as "the substance, the gist, the sting of the libelous charge be justified") (citation & quotations omitted). Here, Plaintiffs have admitted that offshore companies created by their firm were implicated in criminal activity, including money laundering, tax evasion, bribery, and fraud. (SAC ¶ 53 (acknowledging the Panama Papers "confirms" that some of the offshore corporations created by Plaintiffs "appeared to have been utilized by some [end users] for criminal activity including, but not limited to, money laundering, tax evasion, briber and/or fraud"); ¶¶ 53, 69 (admitting some "companies sold by Plaintiffs to

---

[15] The Mossack character does appear at the end of the vignette about a wealthy African businessman residing in the U.S. who uses a bearer bond shell game to bribe and then cheat his own daughter, but that conduct is not criminal. Indeed, the businessman's personal lawyer is someone else entirely, and the Mossack character emphasizes that he is following "the letter of the law."

[16] Even if the Film could be interpreted to portray Plaintiffs as *morally* (though not legally) culpable for the conduct of end users of the M&F-created shell companies, such a statement would be a non-actionable opinion rather than a statement of verifiable fact. *See Partington*, 56 F.3d at 1156 ("statements of personal viewpoint," as opposed to "assertions of objective fact," cannot form the basis of a defamation claim, and holding that a statement about the quality of the plaintiff's legal representation constituted opinion rather than verifiable fact).

original clients were connected to [end user] criminal activity").)[17] The fact that dialogue or certain elements of the storyline of *The Laundromat* were fictionalized does not change the substantial truth of the Film's narrative.

Thus, Plaintiffs are unlikely to succeed in showing that the Film conveys a false statement of fact concerning Plaintiff.

### 2. The alleged injury to Plaintiffs' reputation has already occurred

The SAC is replete with allegations about the extensive damage done to Plaintiffs' business and reputations long *before* the release of the Film in late 2019.

Plaintiffs admit that as a result of the revelations from the 2016 "hack and release" of the Panama Papers, they were rumored in international media to have advised not just powerful political figures, but also "notorious drug cartel and/or other organized crime leaders" on subjects such as "tax evasion, money laundering, fraud and/or other crimes." (SAC ¶¶ 55-56.)  Notably, Plaintiffs repeatedly allege that the resulting press damaged Plaintiffs' "client relations and ongoing business prospects," and resulted in "banks and other third parties refus[ing] to do business" with Plaintiffs, leaving them "unable to bank anywhere in the world." (*Id.* ¶¶ 59-60.)  Plaintiffs' "inability to bank led to closure of [their] offices and ultimately the loss of [their] entire client base." (*Id.* ¶ 61.)

Plaintiffs state that it was the investigations that followed in the wake of the Panama Papers' release that caused them to "suffer [] damage to the goodwill and value of their businesses," as well as two criminal prosecutions in Panama and an anticipated one in the United States. (*Id.* ¶¶ 55-63, 144.)

### 3. Plaintiffs are public figures and will be unable to prove actual malice by clear and convincing evidence

Libel is not a strict liability tort. The requisite degree of fault for liability depends on whether the plaintiff is a public figure or a private figure. *See Gertz v. Robert Welch,*

---

[17] As the Book and Film state, Europol determined that approximately 3500 companies created by Plaintiffs were connected to criminal activity, which is consistent with Plaintiffs' admission that a "small percentage" of their 200,000 entities were, in fact, utilized for such activity. (*See* Burns Decl. at ¶ 16; Bernstein Decl. at ¶ 14 and Ex. 1.)

*Inc.*, 418 U.S. 323, 347 (1974). Owing to their status as limited public figures, Plaintiffs bear the burden to show by clear and convincing evidence that Netflix acted with actual malice in publishing the Film.

### a.   Plaintiffs Are Public Figures

There are two kinds of public figures: "the all-purpose public figure, and the limited purpose or 'vortex' public figure." *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1577 (2005). "The all-purpose public figure is one who has achieved such pervasive fame or notoriety that he or she becomes a public figure for all purposes and contexts. The limited purpose public figure is an individual who voluntarily injects him or herself or is drawn into a specific public controversy, thereby becoming a public figure on a limited range of issues." *Id.* (citing *Gertz*, 418 U.S. at 351; *Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 253 (1984)).  If Plaintiffs qualify as either type of public figure, the actual malice burden of proof will apply to their claims. *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265 (9th Cir. 2013).

According to their own allegations, Plaintiffs already were "well-known worldwide" for their work in the "offshore industry." (*E.g.*, SAC ¶¶ 32, 34.) Even if Plaintiffs do not qualify as all-purpose public figures, they have become limited-purpose public figures due to the role that they assumed in the extensive public debate following the release of the Panama Papers. "In a defamation case, whether the Plaintiff is a limited-purpose public figure is a legal determination to be made by the trial court." *Unsworth v. Musk*, 2019 WL 8220721, at *4 (C.D. Cal. Nov. 18, 2019) (*citing Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016)).

To determine if a plaintiff is a limited-purpose public figure, courts in the Ninth Circuit employ a three-part test: "whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution." *Makaeff*, 715 F.3d at 266.

As to the first component, a determination of whether a public controversy exists, courts consider "if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Waldbaum v. Fairchild Publn's, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). The massive press coverage that followed the leak of the Panama Papers, with its focus on Plaintiffs' role and the resulting reporting regarding Plaintiffs' role in facilitating tax avoidance and offshore banking for the wealthy, represents a quintessential public controversy.

The reports of journalist Bastian Obermayer and ICIJ precipitated numerous governmental investigations and prosecutions. Journalists from all over the world published reports regarding Plaintiffs' clients, and the media extensively covered Plaintiffs' business ties to the leaders of multiple countries including current and former heads of state, and figures in the world of organized crime. (*See* SAC ¶¶ 55-57). There were a number of books (in addition to Bernstein's Book) about the Panama Papers. (*See* Ferber Decl. at ¶¶ 12-14, Exs. 10-12) The ensuing commentary, including discussion of Plaintiffs' role in facilitating tax avoidance for the wealthy, implicated government tax policies and financial controls in numerous countries, such policies having substantial ramifications even for those who do not participate in offshore banking. *See Ampex Corp.*, 128 Cal. App. 4th at 1577-78 (holding former employee's postings regarding management of a publicly traded company qualified as public controversy); *Makaeff*, 715 F.3d at 267 (holding former customer's comments regarding business practices of Trump University were matter of public controversy); *Mosesian v. McClatchy Newspapers*, 233 Cal. App. 3d 1685, 1702 (1991) (holding the "the California regulatory scheme for licensing and oversight…", of horse racing to be matter of public concern).

Moreover, "the passage of time does not alter an individual's status as a limited purpose public figure for that specific controversy." *Unsworth*, 2019 WL 8220721, at *5 (*quoting Partington*, 56 F.3d at 1152). In short, the Panama Papers scandal is "precisely the sort of public controversy anticipated by the limited-purpose public figure doctrine – where 'the press was covering the debate, reporting what people were saying and

uncovering facts and theories to help the public formulate some judgment.'" *Unsworth*, 2019 WL 8220721, at *5 (*quoting Waldbaum*, 627 F.2d at 1297) (holding attempts to rescue Thai youth soccer team from underwater caves were matter of public controversy).

As to the second element, whether the alleged defamation is related to the plaintiff's participation in the controversy, courts hold that "When 'an individual voluntarily injects himself or is drawn into a particular public controversy,' he 'thereby becomes a public figure for a limited range of issues.'" *Unsworth*, 2019 WL 8220721, at *6 (*quoting Gertz*, 418 U.S. at 351). "Under *Gertz*, [Plaintiffs] must have thrust [themselves] to the forefront of this particular controversy in order to influence the resolution of the issues involved." *Makaeff*, 715 F.3d at 267 (citations & quotations omitted).

A plaintiff will be held to have voluntarily injected himself into a public controversy when he participates in newspaper or television interviews regarding the topic. *Unsworth*, 2019 WL 8220721, at *6 (Plaintiff voluntarily appeared before millions of viewers in interview); *see also*; *Hu & Assocs., LLC v. New Life Senior Wellness Ctr., LLC*, 2017 WL 10591754, at *16 (C.D. Cal. July 7, 2017) (plaintiffs voluntarily injected themselves into controversy on immigration programs by appearing for television interviews).

In the present case, Plaintiffs did not shy from the controversy generated by the publication of the leaked Panama Papers. To the contrary, Plaintiffs went on a media offensive in which they proactively sought to influence public opinion. As Plaintiffs admit in their pleading, they spoke with investigative journalist Jake Bernstein and those interviews were later incorporated into the Book that Bernstein authored and served as the basis for the Film. (SAC ¶¶ 74, 76, 79, 83; Bernstein Decl. at ¶¶ 7-8.) They also spoke with Burns while he was working on the screenplay for the Film. (Burns Decl. at ¶ 5.)

In addition, Mossack gave interviews to CNBC and The Wall Street Journal in April 2016, and Fonseca gave an interview to reporters, excerpts of which were subsequently published in a Reuters article and an AP Article in February 2017. (Ferber

Decl. at ¶¶ 6-9, Exs. 4-7.) In these interviews, Plaintiffs proclaimed that they had done nothing wrong, and argued that shell companies had numerous legitimate uses. (*Id.*). This is precisely the type of attempt to influence public opinion that courts routinely hold to satisfy the "voluntary injection" prong of the public figure analysis. *See Gilbert*, 147 Cal. App. 4th at 25 ("Sykes has thrust himself into that debate by appearing on local television shows as well as writing numerous articles ….").

The final prong of the limited public figure analysis merely requires that the alleged defamation relate to Plaintiffs' role in the public controversy. *Makaeff*, 715 F.3d at 266. "[I]n most cases the relationship between the defamation and the public controversy is either obvious or unchallenged." *Unsworth Musk*, 2019 WL 8220721, at *7; *see also Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1017 (N.D. Cal. 2017) (holding environmental group's publications regarding forestry companies logging practices related to public controversy); *Hu & Assocs., LLC, LLC*, 2017 WL 10591754, at *16 (criticisms of plaintiff's business practices related to controversy surrounding immigration program requiring investments); *Heller v. NBCUniversal, Inc.*, 2016 WL 6573985, at *4 (C.D. Cal. Mar. 30, 2016) (dramatized film regarding rap group NWA and depicting former NWA manager related to public controversy).

Here, Plaintiffs played a central role in the extensive public debate following the release of the "Panama Papers" and the system of shell corporations, tax evasion, and corruption which was thereby revealed. The Film directly comments on the role of lawyers, in particular Plaintiffs, in creating and perpetuating the easily exploitable system of offshore shell corporations. The Film includes scenes which dramatize Plaintiffs' response to learning of the leak of the Panama Papers and depict Mossack and Fonseca addressing reporters and proclaiming that they had done nothing wrong. In other words, the allegedly defamatory Film is "germane to the plaintiff's participation in the controversy." *Waldbaum*, 627 F.2d at 1298.

Each prong of the limited public figure test is satisfied, and therefore Plaintiffs qualify as limited public figures. Thus, Plaintiffs bear the burden to show by clear and convincing evidence that Netflix acted with actual malice in publishing the Film.

### b.   Plaintiffs Have Not Sufficiently Alleged and Cannot Prove Actual Malice

Public figures, such as Plaintiffs, must prove not only that an allegedly libelous statement is false and defamatory, but also that the defendant published that statement with constitutional "actual malice," that is "with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson*, 501 U.S. at 510-11 (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). "The standard of actual malice is a daunting one," *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996) – intentionally so in order to ensure "the national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" *New York Times*, 376 U.S. at 270.

The actual malice standard focuses on the defendant's subjective state of mind "at the time of publication." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984). The court must determine "not whether the statements are true or false, but whether the publisher was aware that they were false or recklessly disregarded their truth or falsity." *Herbert v. Lando*, 781 F.2d 298, 306 (2d Cir. 1986) "Reckless disregard" for the truth means "that the defendant actually had a 'high degree of awareness of … probable falsity.'" *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989) (*quoting Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added).

The First Amendment affords defamation defendants yet another safeguard, to wit: that a public figure libel plaintiff must prove actual malice by "clear and convincing" evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57 (1986). Actual malice cannot be implied and must be proven by direct evidence … so as to command the

1  unhesitating assent of every reasonable mind. *Beilenson v. Superior Court*, 44 Cal. App.

2  4th 944, 950 (1996) (emphasis added).

3      There is no question that Plaintiffs cannot meet the stringent actual malice

4  standard. As Plaintiffs acknowledge, the allegedly defamatory statements contained in

5  the Film are based on the Book (SAC ¶¶ 67, 81-82; Burns Decl. at ¶¶ 4, 8-13, 16;

6  Bernstein Decl. at ¶¶ 12-14), which states explicitly what Plaintiffs claim is insinuated by

7  the Film – *i.e.,* that Plaintiffs created shell companies that were ultimately used by

8  criminals or in connection with illegal activities. (*See, e.g.,* SAC ¶¶ 95, 100.)[18]

9      The plot and subplots of the Film depicting criminal activity by other characters

10  (SAC ¶¶ 13, 114-15) are likewise described in the book. The book details the accident

11  involving the tourist boat which turned out to be uninsured due to a scam facilitated by a

12  Irvin Boncamper, a Caribbean accountant who also happened to serve as a nominee

13  director for numerous M&F-created entities. When M&F learned that Boncamper had

14  been arrested, it removed him as a director with backdated documents. (Ferber Decl. at ¶

15  3, Ex. 2 at 183-84.) The book likewise describes the brutal murder of two American

16  tourists by a notorious Mexican drug kingpin, who held property through a company that

17  M&F had set up. (Notably, the Film expresses Plaintiffs' position that they did <u>not</u> know

18  the identity of everyone for whom they established offshore companies.) (*Id.* at 45.) And

19  it tells the story of a politically connected Chinese couple, who used a "white gloves"

20  British middleman and a shell company to launder kickbacks. As depicted in the Film,

21  _____

22  [18] For instance, the Book states: "[Mossack and Fonseca] became the McDonald's of secrecy, selling cheap products that offered limited economic nourishment while clogging the world's financial

23  arteries with tax evasion and sometimes even criminality." (Ferber Decl. at ¶ 4, Ex. 2 at 6-7.) And: "Bearer shares could be used to transfer assets completely anonymously. They were favorite tools of

24  money launderers and one of Mossfon's more popular offerings." (*Id.* at 26.) And: "It's impossible to quantify the impact of money laundering from drug trafficking on Mossfon's business, although it

25  was likely significant." (*Id.* at 27-28.) The Book further describes how "Mossack and Fonseca, members of their small staff, and even their relatives" were directly involved in the administration of

26  shell corporations they created by "serv[ing] as nominee directors for the companies they registered." (*Id.* at 26.) "The nominees signed hundreds of blank forms [which] became legal corporate

27  documents and resolutions. . . . It was of no consequence that the nominees never saw the filled in documents. . . . For the fiction of an active company officer to work as a business concept, it had to

28  be efficient – hence the signed blank." (*Id.* at 26-27.)

1   the wife of the couple subsequently murdered the middleman involved in the laundering,

2   with whom her relationship had soured, in a Chinese hotel. Both she and her husband

3   were ultimately arrested, as portrayed in the Film. (*Id*. at 171-73.) (Again, even though

4   the shell company was, at one point, actually registered to M&F, the Film does not depict

5   M&F as being involved in the murder.) In sum, the allegedly defamatory elements of the

6   Film are all based upon the Book.

7        Not only did Bernstein's qualifications give Netflix no reason to doubt the

8   accuracy of the statements contained in the Book (and indeed, the Complaint alleges

9   none), but also, *the Book was published nearly two years prior to the release of the Film*,

10  and Plaintiffs had never complained to Bernstein about it. (Bernstein Decl. at ¶ 10.)

11  Given circumstances like these – where a film is based upon a pre-existing book, the

12  veracity of which the defendants had no reason to doubt – courts consistently find the

13  publication of the film lacks the requisite actual malice to support a defamation claim.

14  *See Davis v. Costa-Gavras*, 654 F. Supp. at 657 (dismissing defamation claim concerning

15  film based on book absent evidence that "defendants entertained serious doubts as to

16  Hauser's account or that there were obvious reasons to doubt the veracity or accuracy of

17  Hauser's book"); *see also Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1236-37 (6th Cir.

18  1981) (no actual malice where derogatory portrayal of plaintiff in NBC's film about the

19  Scottsboro Boys' trial was based on the trial transcript and a book written about the trial).

20  Even minor variations from the book on which the Film was based are not sufficient to

21  establish actual malice. *See Davis*, 654 F. Supp. at 658 ("[M]inor fictionalization cannot

22  be considered evidence or support for the requirement of actual malice.").

23       The patently satiric, and often absurd, nature of the Film makes a finding of actual

24  malice even less likely. As the California Court of Appeal recently explained in finding

25  that actress Olivia De Havilland had failed to show actual malice in her defamation suit

26  against the makers of the docudrama Feud,

27       When the expressive work at issue is fiction, or a combination of fact and fiction,

28       the "actual malice" analysis takes on a further wrinkle.  De Havilland argues that,

because she did not grant an interview at the 1978 Academy Awards or make the "bitch sister" or "Sinatra drank the alcohol" remarks to Bette Davis, Feud's creators acted with actual malice.  But fiction is by definition untrue. It is imagined, made-up.  Put more starkly, it is false.  Publishing a fictitious work about a real person cannot mean the author, by virtue of writing fiction, has acted with actual malice.

*De Havilland*, 21 Cal. App. 5th at 869.

Plaintiffs therefore must demonstrate that Defendant acted "in the hope of insinuating a defamatory import to the reader, or that it knew or acted in reckless disregard of whether its words would be interpreted by the average reader as defamatory statements of fact." *Id.* at 870 (*citing Good Government Group of Seal Beach, Inc. v. Superior Court of L.A. Cty.*, 22 Cal. 3d 672, 684 (1978) .

This Plaintiffs cannot do. First, the Film includes multiple disclaimers, including in the trailer, all of which make clear that it is a fictionalized work and is not intended to convey statements of fact concerning Plaintiffs. Second, the Film is a patent satire, and the caricaturish Mossack and Fonseca characters are overtly farcical, making it inconceivable that the average viewer would interpret the Film as presenting factual portrayals of them. *See Brodeur*, 248 Cal. App. 4th at 680 (finding character's statement "not reasonably susceptible of a defamatory meaning," in part because "American Hustle is, after all, a farce"). Third, the Netflix executive in charge of creative development for the Film, Collin Creighton, confirms that Defendant lacked the requisite subjective intent to defame Plaintiffs.[19] In conjunction with the absence of any other evidence that Netflix had a high degree of awareness that the portrayal of Plaintiffs in the Film was defamatory, this is compelling evidence that Defendant did not act with the requisite intent – and therefore that Plaintiffs will be unable to carry their burden on this motion to show they are likely to prevail on their defamation claim.

---

[19] (*See* accompanying Declaration of Collin Creighton at ¶¶ 3, 5, filed concurrently herewith, explaining that, because Plaintiffs had never made any legal complaint made about the Book, on which the Film was based, Netflix had no reason for concern about matters portrayed in the Film.)

### D.   Plaintiff Cannot Demonstrate a Reasonable Probability of Prevailing on the Merits of Their State Law False Light Claim

Plaintiffs' false light claim is based on the same and allegations as their flawed libel claims. (*Compare* SAC ¶ 145 *with* SAC ¶ 154). As Plaintiffs admit, their libel claims are premised not on provable falsehoods, but rather on "implications and innuendo" contained in the Film. (SAC ¶ 142.) Because Plaintiffs' false light claim does not materially differ from their libel claims, it should also be stricken. *See Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887 (9th Cir. 2016) ("Because Manzari's libel and false light claims rely on the same set of facts and require her to prove the same elements relevant to this appeal, we consider the two claims collectively."); *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1385 (1999) ("When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action.").

To the extent, if any, that there is any perceived gap between Plaintiffs' libel claims and their false light claim, the false light claim is also lacking in merit. "To prevail on a false light publicity claim, a plaintiff must show that the defendant (1) disclosed to one or more persons information about the plaintiff that was presented as factual but was actually false or created a false impression about the plaintiff; (2) the information was understood by one or more persons to whom it was disclosed as stating something highly offensive that would have a tendency to injure the plaintiff's reputation; (3) by clear and convincing evidence, the defendant acted with constitutional malice; and (4) the plaintiff was damaged by the disclosure." *Ostella v. Taitz*, 2018 WL 6190598, at *4 (C.D. Cal. Oct. 5, 2018), *aff'd*, -- Fed. App'x --, 2020 WL 1818607 (9th Cir. 2020) (citing *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1082 (9th Cir. 2002)).

First, as discussed above, the false light claim fails to meet the threshold requirement of showing that the patently satirical, fictionalized Film conveys objectively false facts regarding Plaintiffs. *See Partington*, 56 F.3d at 1154–55. In addition, while the

Film identifies Plaintiffs as central figures in the story it is telling about the offshore industry, the Film's thematic thrust is that much, if not all, of Plaintiffs' conduct is *legal*. To the extent that the Film suggests that offshore companies created by Plaintiffs' law firm were sometimes used by others to conduct illegal activity, this fact is admitted by Plaintiffs in their pleading.  (SAC ¶¶ 52-53, 69.)

The sole element of the false light analysis which does not overlap with the elements of a defamation claim is whether the alleged false light in which the plaintiff is placed would be "highly offensive to a reasonable person." *Fellows v. Nat'l Enquirer, Inc.*, 42 Cal. 3d 234, 238 (1986). "'To avoid a conflict with First Amendment rights, courts have narrowly construed the highly offensive standard.'" *Brahmana v. Lembo*, 2010 WL 965296, at *4 (N.D. Cal. Mar. 17, 2010) (quoting *Silva v. Hearst Corp.*, 1997 WL 33798080, at *2 (C.D. Cal. Aug. 22, 1997)).

Contrary to the conclusory allegations in the Complaint, the Mossack and Fonseca characters are not depicted as direct participants in criminal activity, or in any other "highly offensive" manner. Rather, the characters function as narrators who explain to the audience how the system of shell corporations and tax shelters derives from Delaware's "corporate-friendly tax laws," leading to the Film's thematic indictment of the system that makes such enterprises largely, if not entirely, *legal*. Even if these characters are presented in a caricaturish manner, such a depiction in a fictionalized work does not rise to the "highly offensive" standard required for a false light claim. *See Sarver*, 813 F.3d at 906 (holding fictionalized depiction of Iraq war soldier would not highly offend a reasonable person even though the film portrayed the character as "fascinated with war and death"); *De Havilland*, 21 Cal. App. 5th at 867 (holding narrative framing device of fictitious interview would not "highly offend" a reasonable person).

As with their libel claims, Plaintiffs' false light claim requires them to show, by clear and convincing evidence, that Netflix acted with constitutional malice in publishing the Film. *Aisenson v. Am. Broad. Co.*, 220 Cal. App. 3d 146, 161 (1990). The "clear and convincing" evidence standard for the malice prong of the false light inquiry is "far in

23

excess of the preponderance sufficient for most civil litigation." *Solano*, 292 F.3d at 1084 (quoting *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997)). As demonstrated above, Plaintiffs' pleading does not come close to satisfying this demanding standard.[20]

Finally, Plaintiffs' false light claim also fails to plead any cognizable theory of damages. Plaintiffs fail to allege any independent injury linked to their false light claim. Even if Plaintiffs were to successfully point out some minor factual error in the Film, "[c]ourts have consistently rejected attempts to base damage claims upon minor factual errors when the gist of the work, taken as a whole, cannot serve as the basis for a . . . false light claim." *Partington*, 56 F.3d at 1161.

Thus, even if separately evaluated from Plaintiffs' materially deficient defamation claims, there is no independent merit to their claim that the Film depicts them in an actionable false light.

**E.    Defendant Cannot Be Held Liable for Commentary About the Film Authored and Published by Third Parties**

Plaintiffs improperly seek to hold Netflix liable for statements made in independent, third-party reviews of the Film.[21] (*E.g.*, SAC ¶¶ 129-138.) Plaintiffs' claims premised on third-party commentaries regarding the Film fail as a matter of law, since a defendant can only be held liable for a defamatory publication in which that defendant participated. *Matson v. Dvorak*, 40 Cal. App. 4th 539, 549 (1995).

Plaintiffs do not (and could not in good faith) allege that Netflix exercised control over the content or publication of the film reviews. A defendant who did not participate

---

[20] Moreover, the Film repeatedly makes clear that it is a fictionalization, not a literal reenactment of actual events. Consequently, Plaintiffs cannot show that Defendant knowingly or recklessly created a false impression of them. *See De Havilland*, 21 Cal. App. 5th at 869 ("Publishing a fictitious work about a real person cannot mean the author, by virtue of writing fiction, has acted with actual malice.").

[21] Plaintiffs also intimate that Netflix should be held liable for the description of the Book that appears on the Amazon page where the Book is offered for sale. (SAC ¶ 91.) However, Plaintiffs provide no basis for this allegation nor any facts that indicate how Netflix is alleged to have published the description of the Book.

in the creation or distribution of an allegedly defamatory statement cannot be held liable for that statement. For example, in *Matson v. Dvorak*, the plaintiff took issue with a campaign flyer published by a political organization. 40 Cal. App. 4th at 543. Plaintiff sued not just the political organization, but also individual defendants that had contributed money to the political organization. *Id.* The defendant's anti-SLAPP motion against the plaintiff political candidate was granted, on the ground that the plaintiff did not allege that the individual defendant "participated in preparing the mailing, knew of its contents in advance of publication, knew that the charges made in the campaign mailer were false, or held any position in the organization from which his oversight of campaign literature can be inferred." *Id.* at 549. Similarly, Plaintiffs make no allegations that Netflix controlled what outlets such as the LA Times or the Guardian published about the Film. In short, Plaintiffs' vague allegation that Netflix "was aware that movie critic reviews would follow the release of [the Film]," even if accepted as true, fails to rise to the level of participation that would be required to hold Netflix liable for the editorial opinions of third-parties.

## IV.     CONCLUSION

Based on the foregoing, Netflix respectfully requests that this Court grant the relief sought in the instant Motion.

**PRYOR CASHMAN LLP**

Dated: June 17, 2020          By:     */s/ Michael J. Niborski*
                                        Michael J. Niborski
                                        *mniborski@pryorcashman.com*

                                        Tom J. Ferber
                                        (Admitted PRO HAC VICE)
                                        *tferber@pryorcashman.com*

                                        *Attorneys for Defendant*
                                        NETFLIX, INC.