Michael J. Niborski (State Bar No. 192111)
*mniborski@pryorcashman.com*
**PRYOR CASHMAN LLP**
1801 Century Park East, 24th Floor
Los Angeles, California 90067-2302
Tel: (310) 683-6616
Fax: (310) 943-3397

Tom J. Ferber (Admitted PRO HAC VICE)
*tferber@pryorcashman.com*
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036-6569
Tel: (212) 421-4100
Fax: (212) 326-0806

*Attorneys for Defendant*
NETFLIX, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOSSACK FONSECA AND CO., S.A., et al.,<br><br>          Plaintiffs,<br><br>    vs.<br><br>NETFLIX, INC.,<br><br>          Defendant. | Case No. 2:19-cv-09930-CBM-AS<br><br>**DEFENDANT NETFLIX INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>[Notice of Lodging of Physical Exhibits filed concurrently]<br><br>Hearing:<br>Date:  July 28, 2020<br>Time:  10:00 a.m.<br>Place:  Courtroom 8B |

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on July 28, 2020 at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Consuelo B. Marshall of the above-entitled Court, located at 350 West First Street, Los Angeles, California, 90012, Courtroom 8B, Defendant Netflix, Inc. ("Netflix" or "Defendant") will, and hereby does, move for judgment on the pleadings pursuant to FRCP 12(c) (the "Motion") on the federal law claims stated against Netflix in the January 21, 2020 Second Amended Complaint (the "SAC") [Docket No. 52] of Plaintiffs Mossack Fonseca & Co., S.A., Bufete MF & Co., Jurgen Mossack, and Ramon Fonseca ("Plaintiffs").

The Motion is made on the grounds that: (1) the fourth and fifth causes of action asserted against Netflix in the SAC—for "Dilution/Tarnishment under 15 U.S.C. [§] 1125(c)" and "False Advertising [under] 15 U.S.C. § 1125"—are barred by the First Amendment; and (2) Plaintiffs cannot establish a probability of prevailing on the merits of their claims. In addition, Netflix requests that they recover from Plaintiffs their attorneys' fees and costs incurred in making this Motion pursuant to 15 U.S.C. § 1117.[1]

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Notice of Lodging of Physical Exhibits, the pleadings and papers on file herein, all other matters of which the Court may take judicial notice, and such other or further material as may be presented at or before the hearing on the Motion.

---

[1] If the Court grants this Motion, Netflix will prove the amount of their attorneys' fees and costs separately.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This Motion is made following several conferences of counsel pursuant to Local Rule 7-3 which took place beginning on February 10, 2020 and concluded on March 11, 2020.

**PRYOR CASHMAN LLP**

Dated: June 17, 2020          By:    */s/ Michael J. Niborski*
                                             Michael J. Niborski
                                             *mniborski@pryorcashman.com*

                                             Tom J. Ferber
                                             (Admitted PRO HAC VICE)
                                             *tferber@pryorcashman.com*

                                             *Attorneys for Defendant*
                                             NETFLIX, INC.

1

# <u>TABLE OF CONTENTS</u>

2  TABLE OF AUTHORITIES ................................................................. ii

3  I.    INTRODUCTION .................................................................1

4  II.   STATEMENT OF FACTS ......................................................2

5       A.  The Panama Papers Scandal ...........................................2

6       B.  *The Laundromat* ..........................................................3

7       C.  Plaintiffs' Allegations ...................................................5

8  III.  ARGUMENT.........................................................................6

9       A. Legal Standard ..............................................................6

10      B. Plaintiffs' Dilution Claim Fails As A Matter Of Law ............7

11          1.  As A Matter Of Law, Plaintiffs' Mark Is Not "Famous" For

12              Dilution Purposes ...................................................7

13          2.  Netflix Is Not Using The MFSA Logo As A Trademark..................9

14          3.  Plaintiffs' Dilution By Tarnishment Claim

15              Fails Because Their Mark Is Already Tarnished .............10

16          4.  The Film Falls Within The Noncommercial Use Exception To

17              The Dilution Statute.................................................11

18      C.  Plaintiffs' False Advertising Claim Fails Under The *Rogers* Rule ........12

19          1.  The Use Of Plaintiffs' Logo Is

20              Artistically Relevant To The Film ....................................13

21          2.  The Film Does Not Explicitly

22              Mislead As To Its Source Or Content ..............................14

23  IV.  CONCLUSION .................................................................17

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**CASES**          **PAGE(s)**

*Aegis Software, Inc. v. 22nd Dist. Agric. Ass'n*,
   255 F. Supp. 3d 1005 (S.D. Cal. 2017) ...........................................................7, 8

*Arcsoft, Inc. v. Cyberlink Corp.*,
   153 F. Supp. 3d 1057 (N.D. Cal. 2015) ..........................................................8, 9

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................7

*Brown v. Elec. Arts, Inc.*,
   724 F.3d 1235 (9th Cir. 2013) .....................................................................13, 15

*Cafasso v. General Dynamics C4 Systems, Inc.*,
   637 F. 3d 1047 (9th Cir. 2011) .............................................................................7

*Chavez v. United States*,
   683 F.3d 1102 (9th Cir. 2012) ..............................................................................7

*Coach Servs., Inc. v. Triumph Learning LLC*,
   668 F.3d 1356 (Fed. Cir. 2012) ............................................................................8

*Dickinson v. Ryan Seacrest Enters., Inc.,*
   No. CV 18-2544-GW (JPRX), 2018 WL 6112628 (C.D. Cal. Oct. 1, 2018)......16

*Dickinson v. Ryan Seacrest Enters., Inc.*,
   No. CV 18-2544-GW (JPRX), 2019 WL 3035090 (C.D. Cal. Mar. 26, 2019)...12

*Dillinger, LLC v. Electronic Arts, Inc.*,
   No. 1:09-cv-1236-JMS-DKL, 2011 WL 2457678 (S.D. Ind. June 16, 2011) .....14

*Durkin v. Shields*,
   No. 92-1003-IEG (LSP), 1997 WL 808651 (S.D. Cal. 1997) ..............................6

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
   547 F.3d 1095 (9th Cir. 2008) ...................................................... 12, 13, 14, 15

*ETW Corp. v. Jireh Publ'g, Inc.*,
   332 F.3d 915 (6th Cir. 2003) ..............................................................................13

**CASES**                                                           **PAGE(s)**

*Gordon v. Drape Creative, Inc.*,

    909 F.3d 257 (9th Cir. 2018) .................................................................11, 12

*Hishon v. King & Spalding*,

    467 U.S. 69 (1984) ....................................................................................6

*Joseph Burstyn, Inc. v. Wilson*,

    343 U.S. 495 (1952) ................................................................................12

*Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc.*,

    868 F. Supp. 2d 172 (S.D.N.Y. 2012) ...................................................13

*Lowden v. T-Mobile USA, Inc.*,

    378 F. App'x 693 (9th Cir., May 10, 2010) ...........................................7

*Mattel v. Walking Mountain Prods*,

    353 F.3d 792 (9th Cir. 2003) .................................................................11

*Mattel, Inc. v. MCA Records*,

    296 F.3d 894 (9th Cir. 2002) .................................................................13

*Medina v. Dash Films, Inc.*,

    No. 15-CV-2551(KBF), 2016 WL 3906714 (S.D.N.Y. July 14, 2016) ........15, 16

*Milne ex rel. Coyne v. Stephen Slesinger, Inc.*,

    430 F.3d 1036 (9th Cir. 2005) ................................................................6

*Rogers v. Grimaldi*,

    695 F. Supp. 112 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989)........12, 13

*Ryan v. Salisbury*,

    382 F. Supp. 3d 1031 (D. Haw. 2019) ..................................................16

*Schad v. Borough of Mt. Ephraim*,

    452 U.S. 61 (1981) ..................................................................................12

*Smith v. Wal-Mart Stores, Inc.*,

    537 F. Supp. 2d 1302 (N.D. Ga. 2008) .................................................11

**CASES** **PAGE(s)**

*Stewart Surfboards, Inc. v. Disney Book Grp., LLC*,

    No. CV 10-2982 GAF (SSX), 2011 WL 12877019 (C.D Cal. May 11, 2011) ...16

*Urban Home, Inc. v. Cordillera Inv. Co.*,

    No. 13-08502, 2014 WL 3704031 (C.D. Cal. June 19, 2014) ............................8

*VIP Prods. LLC v. Jack Daniel's Properties, Inc.*,

    953 F.3d 1170 (9th Cir. 2020) ...................................................................11, 12

**STATUTES & RULES**

Fed. R. Civ. P. 12(c) ............................................................................... 1, 6, 17

15 U.S.C. § 1125(c) ...........................................................................................7

15 U.S.C. § 1125(c)(1) .......................................................................................9

15 U.S.C. § 1125(c)(2)(A) .............................................................................8, 9

15 U.S.C. § 1125(c)(2)(B) .................................................................................9

15 U.S.C. § 1125(c)(3)(C) ...............................................................................11

**TREATISES**

4 *McCarthy on Trademarks and Unfair Competition*, § 24:104 (5th ed.) ...............8

4 *McCarthy on Trademarks and Unfair Competition* § 24:122 (5th ed.) ..... 9, 10, 15

1                       **MEMORANDUM OF POINTS AND AUTHORITIES**

2        Defendant Netflix, Inc. ("Netflix" or "Defendant") respectfully submits this

3 memorandum of law in support of its motion for judgment on the pleadings pursuant

4 to Federal Rule of Civil Procedure 12(c) dismissing Plaintiffs' fourth and fifth claims,

5 for trademark dilution and false advertising under the Lanham Act, respectively, with

6 prejudice.

7 **I.**     **INTRODUCTION**

8        This action concerns the film entitled *The Laundromat* (the "Film").[2] As

9 described in detail below, the Film concerns the so-called "Panama Papers," a cache

10 of documents concerning hundreds of thousands of offshore entities created by

11 Plaintiffs Jurgen Mossack ("Mossack") and Ramon Fonseca ("Fonseca") and their law

12 firm, Mossack Fonseca and Co. S.A. (the "Mossack & Fonseca Firm," and together

13 with Mossack and Fonseca, "Plaintiffs"), in order to facilitate tax avoidance on the

14 part of the wealthy. Beyond mere tax avoidance, several thousand of these offshore

15 entities were also implicated by Europol for alleged involvement with other kinds of

16 criminal conduct, including money laundering, tax evasion, bribery, and fraud, as

17 Plaintiffs themselves acknowledge.

18        The Film seeks to expose the pervasive abuse of offshore shell corporations and

19 tax shelters, and it is an indictment of the legal systems that permit them. Plaintiffs,

20 whose livelihoods depend on the flourishing of the offshore industry, unsurprisingly

21 dislike the Film's message, and they seek to misuse the trademark laws, among others,

22 in order to silence it.

23        In addition to their state law libel and false light claims, which are addressed in

24 Netflix's concurrently-filed anti-SLAPP motion, Plaintiffs assert claims for trademark

25 dilution by blurring and by tarnishment, as well as false advertising based on the

26 allegation that consumers will mistakenly believe that Plaintiffs sponsored or

27

28

---

[2] The Film was submitted as Exhibit A to the Answer of Defendant Netflix, Inc. to Plaintiffs' Second Amended Complaint [Docket No. 53]. A copy of the Film is also attached to the Notice of Lodging of Physical Exhibits filed concurrently herewith.

endorsed the Film. These claims fail as a matter of law. Plaintiffs' dilution claim is hopeless. Not only have Plaintiffs failed to plead sufficiently an essential element of their dilution claim – namely, the fame of their allegedly diluted mark – but also the Film does not use the Plaintiffs' logo as a mark, as it must for the use to be actionable under the federal dilution law. Furthermore, given Plaintiffs' admissions that, before the Film was published, they (i) were already the subject of legal proceedings in Panama, (ii) could no longer bank anywhere, (iii) had lost all of their clients, and (iv) had to shut down their business as a result of the foregoing, their claim that the Film tarnished their mark is risible. Likewise, given Plaintiffs' complaint that the Film tarnished their brand due to its unflattering portrayal of them, their false advertising claim – premised on the allegation that consumers will assume Plaintiffs sponsored or endorsed the Film – hardly rises to the level of plausibility required to pass legal muster. Perhaps most importantly, both claims are barred by the First Amendment, under which the Film is protected speech, which cannot be chilled by Plaintiffs' contrived and meritless trademark claims.

## II.     STATEMENT OF FACTS

### A.     <u>The Panama Papers Scandal</u>

In April 2016, newspapers and media outlets around the world began publishing reports regarding the methods used by wealthy and powerful people to hide income and avoid taxes through the use of offshore bank accounts and shell companies. (Second Amended Complaint ("SAC") ¶¶ 54-57). The primary source for these bombshell reports was a cache of 11.5 million Mossack & Fonseca Firm documents an anonymous whistleblower had provided to journalist Bastian Obermayer of the German newspaper Suddeutsche Zeitung. (*Id*. ¶ 49). Obermayer enlisted the International Consortium of Investigative Journalists to review the massive corpus of documents for approximately one year before publishing any reports regarding their contents. (*Id*. ¶¶ 51-52). These documents, dubbed the Panama Papers, referenced over 200,000 offshore entities created by the Mossack & Fonseca Firm, including

many used for the benefit of rich and famous people in both public and private sectors around the world. (*Id.* ¶ 50). As the SAC acknowledges, some number of offshore corporations created by Mossack and Fonseca, or their firm, were in fact utilized "for criminal activity including, but not limited to, money laundering, tax evasion, bribery and/or fraud." (*Id.* ¶ 53).

The reporting on the Panama Papers and the Mossack & Fonseca Firm's role in facilitating tax avoidance and offshore banking for the wealthy precipitated numerous governmental investigations and prosecutions, including two legal proceedings brought by Panamanian authorities against Mossack and Fonseca. (*Id.* ¶ 62). As a result of the ongoing criminal investigations and prosecutions, Mossack and Fonseca have been subject to arrest and bail conditions that confine them to Panama. (*Id.* ¶ 63). In the immediate aftermath of the reporting on the Panama Papers (*i.e.*, well before the production or release of the Film), banks refused to do business with Plaintiffs, clients ceased to do business with Plaintiffs, and Plaintiffs' law firm closed. (*Id.* ¶¶ 59-61).

In or about November 2017, journalist Jake Bernstein released a "thoroughly researched" book regarding the previously unknown financial dealings of wealthy individuals and institutions that made use of the offshore banking and financial systems, entitled *Secrecy World: Inside the Panama Papers Investigation of Illicit Money Networks and the Global Elite* (the "Book").[3] (*Id.* ¶¶ 67-78). Bernstein used the Panama Papers documents provided by the whistleblower, as well as interviews with Mossack and Fonseca, as source material for the Book. (*Id.*).

## B. *The Laundromat*

Sometime following the publication of the Book, Netflix acquired the right to distribute a film about the Panama Papers that used the Book as inspiration. (*Id.* ¶¶ 80-81. The Film, entitled *The Laundromat*, is the resulting feature film. (*Id.* ¶ 81). The Film stars the actors Meryl Streep, Gary Oldman, and Antonio Banderas and was

---

[3] The Book was submitted as Exhibit B to the Answer of Defendant Netflix, Inc. to Plaintiffs' Second Amended Complaint [Docket No. 53]. A copy of the Book is also attached to the Notice of Lodging of Physical Exhibits filed concurrently herewith.

directed by Steven Soderbergh. (*Id.* ¶¶ 86, 88). The Film does not purport to be a factual documentary or non-fiction adaptation of the Book. To the contrary, the Film makes clear from the outset that it is not a pure dramatic presentation of actual facts, but rather a comedic morality tale about a system which invites and protects abuse. Indeed, the Film opens with a title card facetiously stating that the Film is "**Based On Actual Secrets**" and ends with a disclaimer at the 1 hour, 34 minute, 25 second mark stating, "While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue, and names are fictionalized for the purpose of dramatization.  As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history."

Moreover, while the Film has characters bearing Mossack and Fonseca's names, they are caricatured narrators who break the fourth wall to explain the offshore industry to the audience and introduce the Film's vignettes. The Film does not depict these characters as direct participants in criminal activity. Rather, the Film saves its pointed critiques for the opacity of the global banking system and the systemic corruption of wealthy individuals that permit that system to perpetuate itself.[4]

These palpably farcical characters open the Film, dressed in tuxedoes and walking past cavemen on a barren landscape, with an explanation about the genesis of money and credit with comedic dialogue about the impracticality of bartering bananas (which "turn brown over time") and cows (which "can wander away"). "Credit," they explain, stands in for the "tangible" cow, and because of credit, "even if you didn't have all the bananas you need … you could borrow bananas from the future." Noting that the world of finance has since "gotten a little more complicated" and involves trading things that are "very different from cows," they then introduce the vignettes

---

[4] Rather than portraying these characters as involved in criminal activity, the Film repeatedly makes the point that they followed the letter of the law. At one point, there is even a clip of President Obama noting that most of the use of offshore shell companies is legal.

1   that follow as stories "that are not about us; they are more about you." These narrators
2   are reminders of the Film's satirical nature throughout.

3       The Film depicts the April 2016 hacking of the Panama Papers by "John Doe,"
4   and their subsequent worldwide publication. Plaintiffs' tax shelter and shell
5   corporation mill is exposed. President Obama is seen saying that the problem is that a
6   lot of this is legal. The narrators (*i.e.,* the Mossack and Fonseca characters) explain
7   that they "didn't write the laws; [they] just wrote contracts!" They are ruined by the
8   ensuing scandal, close their businesses, and are arrested because some of the shell
9   entities they formed have been connected to suspected criminals. Sitting in jail (or
10  what is revealed to be dramatic/comedic jail scenery), Mossack complains: "You want
11  to go back to bananas?!" The Film ends with words from the so-called "manifesto" of
12  the Panama Papers leaker, calling on governments around the world to end the
13  pervasive corruption depicted in the Film.

14      **C.    Plaintiffs' Allegations**

15      Plaintiffs' allegations relevant to the instant motion[5] include that the Film's
16  depictions of the MOSSACK FONSECA trademark and logo (collectively, the
17  "MFSA Logo") caused dilution by tarnishment by "diminish[ing] the present and
18  future value of the logo in commerce" (SAC ¶ 176) – notwithstanding the fact that the
19  SAC is replete with allegations of the harm caused to Plaintiffs' reputation, including
20  the goodwill of their business, by the Panama Papers, long before the Film was ever
21  conceived, let alone released. (*Id*. ¶¶ 57-63.) Plaintiffs further allege dilution by
22  blurring, premised only on the conclusory allegation that the depiction of Plaintiffs'
23  logo in the Film "is likely to impair [the trademark's] distinctiveness by causing
24  consumers to no longer associate the logo solely and exclusively with MFSA." (*Id*. ¶
25  177.) As discussed below, however, nowhere in the SAC do Plaintiffs allege that
26  MFSA's logo has attained the level of fame necessary to qualify for protection from

27  _____
28  [5] Plaintiffs' state law claims in the first through third counts of the SAC are addressed Defendant's
    anti-SLAPP motion, filed concurrently with the instant motion for judgment on the pleadings.

trademark dilution (by either tarnishment or blurring) under the controlling federal law, the Trademark Dilution and Revision Act ("TDRA"). Notably, Plaintiffs also acknowledge that "Netflix used and continues to use the logo for the sake of making its movie scenes true to reality. . ." (*id*. ¶ 179), which amounts to an admission under the controlling case law that the MFSA Logo is artistically relevant to the Film, as discussed in greater detail below.

Plaintiffs' fifth count is styled as false advertising, but is premised on alleged false endorsement. Plaintiffs claim Netflix "misrepresented the nature, characteristics, and qualities" of its Film because it misrepresented that the use of the MFSA Logo was "permissible use, authorized, licensed, assigned, sponsored and/or otherwise endorsed by MFSA, when in fact the same is patently false." (SAC ¶¶ 184-85.)

As detailed below, Plaintiffs' trademark claims fail for a number of reasons. Their dilution claim fails because (i) they failed to plead the requisite fame of their mark, (ii) Netflix's depiction of the MFSA Logo is not a trademark use, as it must be to be actionable under the TDRA, (iii) by Plaintiffs' own admission, their Logo, brand, goodwill and reputation were destroyed in the wake of the Panama Papers' release  far before the release of the Film, and (iv) Netflix's use of the MFSA Logo falls within the noncommercial use exception under the TDRA. Further, Plaintiffs' Lanham Act false advertising claim is barred by the First Amendment under the controlling *Rogers* test.

## III.   ARGUMENT

### A.   Legal Standard

The standard for evaluating a 12(c) motion is the same as that governing a motion to dismiss. *See Durkin v. Shields*, No. 92-1003-IEG (LSP), 1997 WL 808651, at *8 (S.D. Cal. 1997) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). That is, "[a] judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a

1   matter of law." *Milne ex rel. Coyne v. Stephen Slesinger, Inc*., 430 F.3d 1036, 1042

2   (9th Cir. 2005) (citation & quotations omitted).

3        The standard articulated in *Twombly* and *Iqbal* applies equally to a motion for

4   judgment on the pleadings. *Chavez v. United States*, 683 F.3d 1102, 1108-09 (9th Cir.

5   2012); *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 & n. 4

6   (9th Cir. 2011) *see also Lowden v. T-Mobile USA, Inc.*, 378 F. App'x 693, 694 (9th

7   Cir. 2010) ("To survive a Federal Rule of Civil Procedure 12(c) motion, a plaintiff

8   must allege enough facts to state a claim to relief that is plausible on its face.")

9   (citation & quotations omitted)). "[A] plaintiff's obligations to provide the grounds of

10  entitlement to relief requires more than labels and conclusions, and a formulaic

11  recitation of the elements of a cause of action will not do." *Id*. (quoting *Bell Atlantic

12  Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Rather, the allegations in the

13  complaint 'must be enough to raise a right to relief above the speculative level.'" *Id*.

14  (quoting *Twombly*, 550 U.S. at 555).

15       **B.      Plaintiffs' Dilution Claim Fails As A Matter Of Law**

16       To prove dilution under the TDRA, 15 U.S.C. § 1125(c), a plaintiff must show

17  that "(1) the mark is famous and distinctive; (2) the defendant is making use of the

18  mark in commerce; (3) the defendant's use began after the mark became famous; and

19  (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution

20  by tarnishment." *Aegis Software, Inc. v. 22nd Dist. Agric. Ass'n*, 255 F. Supp. 3d

21  1005, 1009 (S.D. Cal. 2017) (citation & quotations omitted). Here, Plaintiffs' claim

22  for dilution, by blurring and by tarnishment, fails for four independent reasons,

23  detailed below.

24       **1.      As A Matter Of Law, Plaintiffs' Mark Is Not "Famous" For**

25  **Dilution Purposes**

26       First, Plaintiffs have failed to plead that the MFSA logo is a famous mark under

27  the exacting standard of the TDRA, which requirement applies equally to a claim for

28  dilution by blurring or by tarnishment. *See id*. (granting motion to dismiss dilution

claim because the plaintiff's complaint "falls short of pleading fame"). In order to be "famous," a mark must be "*widely recognized by the general consuming public of the United States*…" as a designation indicating a single source of goods or services. 15 U.S.C. § 1125(c)(2)(A) (emphasis added). This is a "difficult and demanding" standard, *Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1065 (N.D. Cal. 2015) (citation omitted), and one to which Plaintiffs' SAC unquestionably does not rise. *See, e.g., Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356 (Fed. Cir. 2012) (evidence did not prove COACH was a "famous" mark for dilution purposes). A number of courts, including those in the Ninth Circuit, have said that to qualify as "famous" for purposes of dilution, the mark must be a "household name" – "a name immediately familiar to very nearly everyone, everywhere in the nation." 4 *McCarthy on Trademarks and Unfair Competition*, § 24:104 (5th ed.); *Aegis Software, Inc.*, 255 F. Supp. 3d at 1009 ("The famousness prong of the claim is meant to carefully limit the class of trademarks eligible for dilution protection . . . [T]he mark must be a household name.") (citation & quotations omitted); *Arcsoft, Inc.*, 153 F. Supp. 3d at 1065 ("[T]he Ninth Circuit has concluded that trademark dilution is a cause of action reserved for a select class of marks – those marks with such powerful consumer associations that even noncompeting uses can impinge on their value. . . Dilution protection extends only to those whose mark is a household name.") (internal quotation marks and citations omitted).  Thus, niche fame in a particular industry or consumer group is insufficient. *Urban Home, Inc. v. Cordillera Inv. Co.*, No. 13-08502, 2014 WL 3704031, at *6 (C.D. Cal. June 19, 2014) (noting that "[t]he trademark dilution statute was revised in 2006 to deny protection to marks whose fame extends only to niche markets…").

In order to determine whether a mark has attained the requisite level of fame, courts evaluate four factors: (i) the duration, extent and geographic reach of the advertising and publicity of the mark; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual

recognition of the mark; and (iv) whether the mark has been federally registered. 15 U.S.C. § 1125(c)(2)(A).

Here, Plaintiffs make only the unsupported, conclusory assertion that the MFSA logo was famous at the time Netflix allegedly infringed it, providing no factual allegations concerning any of the relevant four factors to support that claim. (SAC ¶¶ 6, 35, 124, 171.) At their most detailed, Plaintiffs allege they are "a well-known worldwide leader in the perfectly legal offshore corporate formation and maintenance industry" (SAC ¶ 32), and that they have generated "significant profits" (*id*. ¶¶ 33, 48) and "expended significant monies on client development, branding, and marketing . . ." (*id*. ¶ 34). However, they provide *no* figures to support these conclusory claims. Naked assertions of fame are patently insufficient to withstand a motion for judgment on the pleadings. *See, e.g., Arcsoft, Inc.*, 153 F. Supp. 3d at 1067 (granting motion to dismiss dilution claim where plaintiff "[did] not offer any nonconclusory allegations about the extent to which consumers actually recognize the Perfect365 Mark").

At best, Plaintiffs have alleged only niche fame, claiming that their "logos were widely recognized by consumers *in Plaintiffs' industry* and became famous well prior to Netflix's unlawful use of the logo." (SAC ¶ 171 (emphasis added); *see id*. ¶¶ 39-41 (alleging Plaintiffs' promotion of their brand in the legal industry.)) Thus, by Plaintiffs' own admission, their mark and logo are not sufficiently famous to merit protection under Section 43(c) of the Lanham Act.

## 2. Netflix Is Not Using The MFSA Logo As A Trademark

Second, Netflix is not using the MFSA logo as a trademark, as is required under the TDRA. The TDRA makes clear that "a non-trademark use does not and cannot dilute by blurring. The same rule applies to dilution by tarnishment." 4 *McCarthy on Trademarks and Unfair Competition* § 24:122 (5th ed.); *see* 15 U.S.C. § 1125(c)(1), 1125(c)(2)(B) & (C). Here, taking all of Plaintiffs' allegations as true, Netflix's depiction of the MFSA trademark in the Film is not trademark use. (*See* SAC ¶ 7 ("The logo is used approximately 8 times between the trailer and the movie proper,

exposed on the side of a building, on a client folder, twice behind a transparent door in an office, on a background re-broadcast of a CNN news segment, and three times in scene backgrounds projected on large screen televisions, including one instance lasting approximately 30 seconds.").) The MFSA logo is not used as a designation of source of the Film in any way, to identify either the author of the screenplay or the producer of the Film. As Professor McCarthy states in his seminal treatise on trademark law, "<u>a novelist who uses a famous mark in the body of a story is not subject to the antidilution law because the accused use is not as a mark or trade name to identify the author or publisher. This also includes the use of marks in the content of motion pictures and television shows</u>." 4 *McCarthy on Trademarks and Unfair Competition*, § 24:122 (emphasis added). Accordingly, Netflix is not subject to the antidilution law based on its display of the MFSA logo in the Film, and Plaintiffs' dilution claim should be dismissed.

### 3. Plaintiffs' Dilution By Tarnishment Claim Fails Because Their Mark Is Already Tarnished

Third, beyond its lack of fame, Plaintiffs' Logo and the goodwill that it represents have already been so thoroughly tarnished that its portrayal in the Film – in connection with the same subject matter that has already made headlines throughout the United States – cannot possibly sustain a claim for tarnishment. For instance, as the SAC acknowledges, "[i]mmediately after initial news reports of hack revelations, and the rumors concerning [Plaintiffs'] alleged clients, banks and other third parties refused to do business with [Plaintiffs' firms]." (*Id.*, ¶ 59.) As a consequence of the "severe[] damage[]" caused to Plaintiffs' firms' reputation (*id.*, ¶ 58), it ultimately was forced to close its offices and lost its entire client base. (*Id.*, ¶ 61.) As Plaintiffs admit, they have already "suffered damage to the goodwill and value their business" as a result of the "hack and release" of the Panama Papers. (*Id.*, ¶ 64.)

1
2

    **4.**    **The Film Falls Within The Noncommercial Use Exception To The Dilution Statute**

3
4
5
6
7
8
9

    Finally, as the Film is an artistic work, its use of Plaintiff's logo falls within the "noncommercial use" liability exemption to dilution protection under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)(3)(C), because it "does more than propose a commercial transaction" and contains some "protected expression." *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1176 (9th Cir. 2020) (citation & quotations omitted). As the Ninth Circuit has held, use of a mark may be "noncommercial" even when it is contained in a product that is sold. *Id.*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

    Here, there is no question the portrayal of the MFSA logo in the Film qualifies as noncommercial speech protected by the First Amendment. It is an artistic work that does far more than "propose a commercial transaction," and unquestionably contains "protected expression," namely, a particularized message, which is likely to be understood by those who viewed it. *See Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 268 (9th Cir. 2018). Indeed, the Film presents a farcical view of the conduct, including that of Plaintiffs, exposed in the "Panama Papers," and is intended to provide a critical commentary on the use of offshore companies to provide tax shelters for the wealthy. *See VIP Prod. LLC*, 953 F.3d at 1176 (holding the defendant was entitled to judgment in its favor on dilution claim where defendant's product conveyed a humorous message that was a commentary on the plaintiff's brand); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008) (quoting *Mattel v. Walking Mountain Prods*, 353 F.3d 792, 812 (9th Cir. 2003) ("[T]arnishment merely caused by an . . . artistic parody which satirizes [the complainant's] . . . image is not actionable under an anti-dilution statute because of the free speech protections of the First Amendment.") (quotations omitted)). Thus, the First Amendment principles codified in the noncommercial use exception under the TDRA likewise bar Plaintiffs' dilution claim against the Film.

28

**C.**     **Plaintiffs' False Advertising Claim Fails Under The *Rogers* Rule**

Just as the First Amendment bars Plaintiffs' dilution claim, it likewise bars their Lanham Act false advertising claim. As noted above, artistic expression, such as Defendant's film, is constitutionally protected speech. The application of the First Amendment's protections to motion pictures and other works of entertainment has been established since the Supreme Court's decision in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952), in which the Court recognized that "[t]he importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." *Id.* at 501; *see also Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee.") (citations omitted).[6]

The conflict between Lanham Act claims and First Amendment protection for artistic works was addressed in the seminal case of *Rogers v. Grimaldi*, 695 F. Supp. 112 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989), which held that the First Amendment precludes Lanham Act claims premised upon the title of an expressive work unless the title "has *no* artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [it] *explicitly* misleads as to the source or the content of the work." *Id.* at 999 (emphasis added). The *Rogers* test has been widely adopted, including by the Ninth Circuit, and extended to use of both names and trademarks in the *content* of expressive works, as well as their titles, leading to such claims regularly being dismissed as a matter of law. *See, e.g., VIP Prods. LLC*, 953 F.3d at 1174 (use of trade dress in dog toy); *Gordon*, 909 F.3d at 264 (use of trademark in greeting card); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547

---

[6] To the extent that Plaintiffs' false advertising claim is predicated on advertisements for the Film, as opposed to the Film itself, it is settled law that "advertisements that are 'adjunct' to a protected work are entitled to the same immunity from [Lanham Act claims] as the underlying work." *Dickinson v. Ryan Seacrest Enters., Inc.*, No. CV 18-2544-GW (JPRX), 2019 WL 3035090, at *8 (C.D. Cal. Mar. 26, 2019).

F.3d 1095, 1099 (9th Cir. 2008) (use of trade dress in video game); *Mattel, Inc. v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002) (use of trademark in title and content of song); *see also ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 928 (6th Cir. 2003) (use of name and trademark in marketing materials for prints of painting); *Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 177 n.9 (S.D.N.Y. 2012) (use of trademark in context of film).

The *Rogers* test has been applied to bar claims of trademark infringement, false endorsement, and false advertising made against expressive works. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013) (applying *Rogers* test to false endorsement claim); *Rogers*, 875 F.2d 944 (involving false advertising claim arising under the Lanham Act). Thus, the *Rogers* test is applicable to Plaintiffs' false advertising claim in the instant action. Here, Plaintiffs are unable to satisfy either prong of the *Rogers* test, requiring dismissal of their false advertising claim.

## 1.   The Use Of Plaintiffs' Logo Is Artistically Relevant To The Film

Regarding the first prong of the *Rogers* test, courts have found that the threshold for finding that the trademark at issue has artistic relevance to the underlying work is "appropriately low." *Rogers*, 875 F.2d at 999; *see Louis Vuitton*, 868 F. Supp. 2d at 178 ("The threshold for artistic relevance is purposely low and will be satisfied unless the use has *no* artistic relevance to the underlying work *whatsoever*") (citations & quotations omitted) (emphasis in the original); *E.S.S. Entm't 2000, Inc.*, 547 F.3d at 1100 (finding that "the level of relevance merely must be above zero" to "merit First Amendment protection").

Here, Defendant more than meets that "appropriately low" threshold. The Film employs the names of Plaintiffs, along with the names of their law firms, and the logo of MOSSACK FONSECA, all in the course of telling the fictionalized story of how these two lawyers found and exploited loopholes to help wealthy and powerful individuals and companies avoid taxation and other liabilities, largely through the

creation of offshore shell companies. Because these men and their companies, identified by the MOSSACK FONSECA logo, all feature in the real life events on which the Film is based, their use is artistically relevant to the work. *See E.S.S. Entm't 2000, Inc.*, 547 F.3d at 1095, 1098, 1100 (finding that video game creator's use of "Pig Pen," a virtual, cartoon-style strip club similar in look at feel to trademark owner's Los Angeles strip club, was protected by the First Amendment from trademark and trade dress infringement claims; the court found artistic relevance because the creator sought to create a "cartoon-style parody of East Los Angeles," and "a reasonable way, to do that is to recreate a critical mass of the businesses and buildings that constitute it"); *Dillinger, LLC v. Electronic Arts, Inc.*, No. 1:09-cv-1236-JMS-DKL, 2011 WL 2457678, at *5 (S.D. Ind. June 16, 2011) (finding the name "Dillinger" in reference to a Tommy Gun was artistically relevant to the defendants' The Godfather video game because "the gentleman-bandit, commonly known for his public persona as a flashy gangster who dressed well, womanized, drove around in fast cars, and sprayed Tommy Guns, has above-zero relevance to a game whose premise enables players to act like members of the mafia and spray Tommy Guns.") (citation & quotations omitted). Indeed, Plaintiffs themselves acknowledge that "Netflix used and continues to use the logo for the sake of making its movie scenes true to reality…" (SAC ¶ 179.) Thus, Plaintiffs effectively concede that the use of Plaintiffs' logo is artistically relevant to the Film.

## 2.      The Film Does Not Explicitly Mislead As To Its Source Or Content

The SAC also fails to satisfy the second prong of the *Rogers* test, namely, the Film does not explicitly mislead as to its source. It is well-settled that the mere use of Plaintiffs' trademark is not sufficient to satisfy this prong of the *Rogers* test. "After all, a trademark infringement claim presupposes a use of the mark. If that necessary element in every trademark case vitiated a First Amendment defense, the First Amendment would provide no defense at all." *E.S.S. Entm't 2000, Inc.*, 547 F. 3d at

1099. Instead, the defendant must "*explicitly* mislead consumers" as to the source or content of the work. *Brown*, 724 F.3d at 1245 (emphasis in the original).

Here, the SAC is devoid of any allegation that the Film or its advertising, make any claims about Plaintiffs' endorsement of or approval of the Film, or any role they played in creating it. Indeed, neither the Film, nor any related promotion, makes any such claim. Thus, the Film does not explicitly mislead as to the source or content of the work.

In fact, the Film does precisely the opposite. It repeatedly makes clear that it is a fictionalization, including by incorporating disclaimers that it is "*based* on actual secrets. This disclaimer expressly counsels consumers against viewing the Film's content as factual and make it unlikely that consumers would interpret a trademark portrayed in the fictional work as a "source-denoter." *Medina v. Dash Films, Inc.*, No. 15-CV-2551 (KBF), 2016 WL 3906714, at *5 (S.D.N.Y. July 14, 2016). Indeed, even apart from the Film's disclaimers, consumers do not expect the trademark of a character or entity portrayed in a fictional work to denote that fictional work's author or creator. *See, e.g.*, 4 *McCarthy on Trademarks and Unfair Competition*, § 24:122 (noting that use of a mark as an element in a film is not trademark use, as it does not designate the film's source).

Moreover, here, the context of Netflix's use of Plaintiffs' logo makes it highly unlikely that consumers would assume Plaintiffs to be the source of the Film. As stated in the SAC, Plaintiffs use their logo in connection with their Panamanian corporate law firm and their work as attorneys. (*See* SAC ¶¶ 33, 37.) No reasonable consumer would assume that Plaintiffs' Panamanian law firm branched out into the production of an American film, let alone one that is critical of their own work. *See E.S.S. Entm't*, 547 F.3d at 1100-01 ("A reasonable consumer would not think a company that owns one strip club in East Los Angeles, which is not well known to the public at large, also produces a technologically sophisticated video game like San Andreas.").

As the *Medina* court noted, "[t]his is particularly true where defendants employed their own source designations elsewhere on the product," as is the case here. *Id*. The Film is accessible only on the Netflix platform, bears the Netflix red "N" logo on the front of the Film, and the opening credit page reads, "NETFLIX PRESENTS…,"[7] leaving little doubt as to the source of the Film. *See Dickinson v. Ryan Seacrest Enters., Inc.*, No. CV 18-2544-GW (JPRX), 2018 WL 6112628, at *6 (C.D. Cal. Oct. 1, 2018) ("Near the beginning of the Episode, the cast members, producers, and companies behind the Episode are listed, with Dickinson failing to appear on that list."); *Stewart Surfboards, Inc. v. Disney Book Grp., LLC*, No. CV 10-2982 GAF (SSX), 2011 WL 12877019, at *7 (C.D Cal. May 11, 2011) (dismissing trademark claims for, *inter alia*, failure to meet *Rogers* test's second prong, and holding that allegedly infringing book, though containing plaintiff's trademark on the back cover, "does not say anything like 'Brought to You by Stewart Surfboards' or 'Presented by Stewart Surfboards'…[and] [t]o the contrary, the book jacket and spine include [various Disney logos]…").

Further, given the satirical and critical nature of in the Film, it is inconceivable that viewers would assume Plaintiffs endorsed or approved of the Film. Indeed, Plaintiffs' dilution by tarnishment claim alleges that the Film has damaged their brand through its *negative* portrayal in the Film. They cannot have it both ways, claiming both that the Film tarnishes their reputation and that consumers will assume they have sponsored or endorsed the Film. *See Dickinson*, 2018 WL 6112628, at *6 (finding nothing suggested that the plaintiff, who was portrayed as the "nemesis" in the subject episode of a reality television show, "somehow endorsed or backed the Episode"). In sum, the SAC is devoid of any allegation from which this Court might plausibly conclude that the Film explicitly misleads as to the source or content of the work.

---

[7] These elements of the Film's source designation are all apparent from the face of the Film itself, which is incorporated by reference in the SAC and therefore may be considered on Defendant's instant motion for judgment on the pleadings. *See Ryan v. Salisbury*, 382 F. Supp. 3d 1031, 1051 (D. Haw. 2019).

Because the use of Plaintiffs' Logo is artistically relevant to the Film and the Film does not explicitly mislead consumers as to the source or content of the work, Plaintiffs' Lanham Act false advertising claim is barred by the First Amendment under the *Rogers* test and thus fails as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' dilution and false advertising claims against Netflix's Film fail as a matter of law. Thus, Netflix respectfully requests that its Rule 12(c) motion be granted in its entirety and that the fourth and fifth counts of the SAC be dismissed with prejudice.

**PRYOR CASHMAN LLP**

Dated: June 17. 2020          By:     */s/ Michael J. Niborski*
                                     Michael J. Niborski
                                     *mniborski@pryorcashman.com*

                                     Tom J. Ferber
                                     (Admitted PRO HAC VICE)
                                     *tferber@pryorcashman.com*

                                     *Attorneys for Defendant*
                                     NETFLIX, INC.