RICHARD G. NOVAK (SBN 149303)
Law Offices of Richard G. Novak
65 N. Raymond Ave., Suite 320
Pasadena, CA 91103
626-578-1175 (voice)
626-685-2562 (facsimile)
E-Mail: Richard@RGNLaw.com
**(Local Counsel)**

STEPHAN SEEGER, Esq. (**admitted *pro hac vice***)
Law Offices Stephen J. Carriero, LLC
810 Bedford Street, Suite#3
Stamford, CT  06901
(203) 273-5170 (voice)
(203) 357-0608 (facsimile)
E-mail: Seegerkid2@aol.com

Attorneys for Plaintiffs
MOSSACK FONSECA CO., S.A.,
BUFFET MF & CO; JÜRGEN MOSSACK;
RAMON FONSECA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL

## DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOSSACK FONSECA & CO., S.A, BUFETE MF & CO., JÜRGEN MOSSACK and RAMON FONSECA<br><br>Plaintiffs,<br><br>v.<br><br>NETFLIX INC.,<br><br>Defendant. | Case No: 2:19-cv-09330-CBM-AS<br><br>**PLAINTIFFS MOSSACK FONSECA CO., S.A., BUFFET MF & CO; JÜRGEN MOSSACK; AND RAMÓN FONSECA'S OPPOSITION TO DEFENDANT NETFLIX'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12(C)**<br><br>Hearing Date:  August 18, 2020<br><br>Hearing Time:  10:00 a.m. |

PLAINTIFFS, by and through their counsel of record Richard G. Novak and

Stephan Seeger, hereby file their Opposition to Defendant's Motion for Judgment on the

1   Pleadings Pursuant to FRCP 12(c).

2     The Opposition is based upon the attached memorandum of points and

3   authorities,  all files and records in this case, and such further information as may be

4   provided to the Court.

5

6             Respectfully submitted,

7

8   DATED: July 12, 2020    Law Offices of Richard G. Novak

9

10          By: */s/ Richard G. Novak*
              RICHARD G. NOVAK

11            Attorneys for Plaintiffs
              MOSSÁCK FONSECA CO., S.A.,

12            BUFFET MF & CO; JÜRGEN
              MOSSACK; RAMÓN FONSECA

13

14  DATED: July 12, 2020    Law Offices Stephen J. Carriero

15

16          By: */s/ Stephan Seeger*
              STEPHAN SEEGER

17            Attorneys for Plaintiffs
              MOSSÁCK FONSECA CO., S.A.,

18            BUFFET MF & CO; JÜRGEN
              MOSSACK; RAMÓN FONSECA

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

1

## TABLE OF CONTENTS

2  TABLE OF AUTHORITIES ........................................................................... iii

3  I.     INTRODUCTION ............................................................................ 1

4  II.    STATEMENT OF FACTS ............................................................... 1

5         A.    Plaintiffs Business Model and Future Plans ............................ 1

6         B.    Trademarked Logos and Treaty Status ...................................... 2

7         C.    The Hack and Resulting Panama Papers Scandal...................... 4

8         D.    "The Laundromat:  Trailer and Movie Use of the Logo ........... 5

9  III.   LAW AND ARGUMENT.................................................................. 9

10        A.    Legal Standards ......................................................................... 9

11              i.    Standards upon 12(c) Motion for Judgment on Pleadings ................... 9

12              ii.   Defendant's Memorandum Introduces Extrinsic Evidence ................ 12

13              iii.  Plaintiffs Should Be Afforded Discovery and/or the SAC Can Be

14                    Amended to Address any Insufficiency in the Pleadings ................... 12

15        B.    Claims in Count IV and V are Properly ................................... 13

16              i.    Plaintiffs Can Establish Trademark Dilution Alleged in Count

17                    Four ....................................................................................... 13

18                    (a) Elements of Dilution by Tarnishment ............................ 13

19                    (b) Inter American Convention; Foreign Marks and "famousness" .... 15

20                    (c) Defendant's other Trademark Defenses Are Untenable................. 19

21                          1.  Disclaimer Is Insufficient and Used Inconsistently................... 19

22                          2.  Defendants are Using the Plaintiff's Logo as a Trademark ....... 20

23                          3.  "Non-Commercial" Use Is not Raised in the Defendant's

24                              Answer ...................................................................... 21

25                          4.  Defendant's "Road Kill" Theory of Damages Is not Rooted

26                              in Reality................................................................... 21

27              ii.   Plaintiffs Can Prevail on their Federal False Advertising Claim ........ 23

28

(a) Elements of Plaintiffs' False Advertising Claim are
Established ...................................................................... 23

(b) Defendant's Rogers Argument Is Unavailing ................................. 24

III.    CONCLUSION ................................................................ 28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES

**Cases**

*Arc Ecology v. United States Dep't of the Air Force*, 411 F.3d 1092 (9th Cir. 2005) ... 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................... 10

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062 (9th Cir. 2006) ................................................................................................................ 20

*Bacardi Corp. of America v. Domenech,* 311 U.S.150 (1940) ...................................... 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 10, 11

*British-American Tobacco Co. Ltd. v. Philip Morris Inc.,* 55 U.S.P.Q.2d 1585, 2000 WL 1005433 (T.T.A.B. 2000) ................................................................................. 16

*Cardio-Medical* Associates, Ltd. v. Crozer-Chester Medical Center, 536 F. Supp. 1065 (E.D. Pa. 1982) .................................................................................................... 10

*Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468 (9th Cir. 1994) ................ 10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 12

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980) ..................................................................... 24

*CYBERsitter, LLC v. Google Inc.*, 905 F. Supp. 2d 1080 (C.D. Cal. 2012) .................. 10

*Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188 (9th Cir. 1989) .............................. 11

*Fairfield County Medical Assoc., v. United Healthcare of New England*, 985 F. Supp. 2d 262 (D. Conn. 2013) .......................................................................................... 22

*Gonzalez v. Law Office of Allen Robert King*, 195 F. Supp. 3d 1118 (C.D. Cal. 2016) .. 9

*Gordon v. Drape Creative, Inc.*, 897 F.3d 1184 (9th Cir. 2018) ................................... 25

*Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 270 (9th Cir. 2018) .................. 25, 26, 27

*Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088 (9th Cir. 2004) 17, 18, 19

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542 (9th Cir. 1989) .......... 9

*Havana Club Holding, S.A. v. Galleon*, S.A., 62 F. Supp. 2d 1085 (S.D.N.Y. 1999) ... 16

*Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628 (9th Cir. 2008) ....................................... 13

*Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890 (C.D. Cal. 2014) ................................................................................................................... 9, 10

*Levi Strauss & Co. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158 (9th Cir. 2011) 13

*Lopez Reyes v. Kenosian & Miele, LLP*, 525 F. Supp. 2d 1158 (N.D. Cal. 2007) .......... 9

*Marrero v. Patterson,* 2018 WL 4207261 (N.D. Cal. Sept. 4, 2018)...............................9

*Moran v. Peralta Cmty. Coll. Dist.*, 825 F. Supp. 891 (N.D. Cal. 1993).......................11

*Mostowy v. United States*, 966 F.2d 668 (Fed. Cir. 1992) ............................................10

*Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994)..............................................................................................22

*Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337 (9th Cir. 1995)...........................................10

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000)...............12

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004) .............13

*Pac. W. Group, Inc. v. Real Time Solutions*, 321 Fed. Appx. 566 (9th Cir. 2008)........11

*Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir.1998) .................................21

*Parks v LaFace Records*, 329 F. 3d 437 (6th Cir. 2003)................................................25

*Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977)..........................................................................................................22

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ........................................24, 25, 26, 27

*Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO, 2015 WL 1526590 (C.D. Cal. Mar. 17, 2015)........................................................................................................10

*Stouffer v. Nat'l Geographic Partners, et. al.*, 400 F. Supp. 3d 1161 (D. Colo. 2019)  25, 26, 27

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .......................................................9

*Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036 (C.D. Cal. 2014) .............................13

*Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788 (9th Cir. 1981)....................14, 20, 21

*United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011) ...........................13

*United States v. White*, 893 F. Supp. 1423 (C.D. Cal. 1995) ..........................................9

**Statutes**

15 U.S.C. § 1125(a) .......................................................................................................23

15 U.S.C. § 1125(c)(1).....................................................................................................20

15 U.S.C. § 1125(c)(2)(c) ..........................................................................................14, 20

15 U.S.C. § 1126 (2000) .................................................................................................17

15 U.S.C. § 1127.............................................................................................................20

The Lanham Act ....................................................................................................... passim

**Other Authorities**

1929 General Inter-American Convention for Trade Mark and Commercial Protection
............................................................................................................ passim

5C Wright & Miller, Federal Practice and Procedure § 1367 (3rd ed. 2004) ................ 12

**Rules**

Fed. R. Civ. P. 12(b) ........................................................................................ 12

Fed. R. Civ. P. 12(b)(6) ............................................................................ 9, 10, 11

Fed. R. Civ. P. 12(c) ................................................................... 10, 11, 12, 21

Fed. R. Civ. P. 12(d) ..................................................................................... 11

Fed. R. Civ. P. 56 ................................................................................ 11, 12, 19

Fed. R. Civ. P. 56(c) ....................................................................................... 12

**Constitutional Provisions**

U.S. Const. Amend. I ................................................................... 24, 25, 26, 27

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs **MOSSACK FONSECA CO., S.A. ("MFSA"), BUFFET MF & CO. ("MF"), JÜRGEN MOSSACK** ("**MOSSACK**") and **RAMÓN FONSECA ("FONSECA"),** hereinafter collectively referred to as "**MFGROUP,**" respectfully submit this Memorandum of Law in support of their Opposition to Defendant Netflix's Motion for Judgment on the Pleadings pursuant to FRCP 12(c), and respectfully request this Court to deny Defendant's Motion as the same pertains respectively to the Fourth and Fifth Counts of the Second Amended Complaint (hereinafter "SAC"), sounding in trademark dilution and federal false advertising under the Lanham Act.

## I.   INTRODUCTION

In its movie "The Laundromat," the Defendant defames and portrays the Plaintiffs as flamboyant lawyers involved in money laundering, tax evasion, bribery and/or other criminal conduct;  in the process, the Defendant also disparages and dilutes the Plaintiffs' logo absent permission, license and/or other authority, and for no necessary or colorable artistic purpose and/or constitutional benefit of expression. The Defendant places the logo in its trailer and movie scenes where viewers easily associate the Plaintiffs' protected intellectual property with serious criminal and unethical behavior.  Academy award winner Gary Oldman plays Plaintiff, **MOSSACK**, and acclaimed actor Antonio Banderas plays Plaintiff, **FONSECA,** both of whose real names are used in the film.  (SAC ¶ 2).

## II.   STATEMENT OF FACTS

### A.   *Plaintiffs Business Model and Future Plans*

**MFGROUP** were primarily engaged in the business of forming and maintaining offshore companies (hereinafter "products") for law firms, accountants and/or other institutional/professional clientele (hereinafter "original clients");  they purchased the products for use by their own independent and separate clients.  While **MFGROUP** sold these products in Panama and other "tax haven" countries, it did not counsel,

advise and/or provide legal advice to the ultimate end users of the products (hereinafter "**UEUs**").  For over 42 years **MFGROUP** built a reputation of trust and professionalism and became well-known worldwide leaders in offshore corporate formation and maintenance.  During this time of industry prominence, **MFGROUP** generated significant profits by organizing and selling offshore companies, and charging fees for related corporate services including maintenance, annual filings and other compliance related services.  To be sure, **MFGROUP** expended significant monies on client development, branding, and marketing its products worldwide, via sponsorship, advertising, community activism, conferencing, charity and/or public service.  (*Id.* ¶¶ 27-34).

### B.  *Trademarked Logos and Treaty Status*

In an effort to develop its brand, **MFSA** caused logos to be registered in various jurisdictions including Panama, the European Union, and Colombia, the same having been used in commerce worldwide and having generated significant notoriety and fame. (*Id.* ¶ 35).  In efforts to expand the brand, attract business, generate and maintain goodwill and name recognition, **MFSA** secured and continues to enjoy the protections of its trademarked logos in the Country of Colombia, to wit:



duly registered with the Superintendencia Industria y Comercio, Republic of Colombia, including (1) Expediente No. 10-053693 – Certificado de Registro 412048, (2) Expediente No. 10-053705 – Certificado de Registro 412052, and (3) Expediente No. 10-053702 – Certificado de Registro 412051.  (*Id.* ¶ 36 & Affidavit of Arthur Ventura Jr. ¶ 22 (Ex. 1 to Plaintiff's Verified Complaint) (hereinafter "Ventura Affidavit")). Ultimately, **MFGROUP** invested significant time, energy, and funds, developing both

their individual and corporate reputations.  (*Id.* ¶ 38).  Even over the last several years, **MFSA** expended many thousands of dollars purchasing items bearing its logo for use in branding and worldwide marketing/advertising of its products and services.  (*Id.* ¶ 37; *see also* Affidavit of Arthur Ventura Jr. ¶ 22).

     **JÜRGEN MOSSACK** and **RAMÓN FONSECA**, promoted their company products and contributed to the enhancement of the offshore industry by, *inter alia*, participating in forums, holding/sponsoring seminars, accepting speaking engagements, advising government officials, participating in charities, and maintaining membership in groups such as the Chamber of Commerce and Rotary Club.  (SAC ¶ 39). **MFGROUP's** involvement in community affairs, industry development, charitable works, and government advisement, enhanced and elevated **MFGROUP's** reputation both locally and worldwide;  as lawyers and law firms **MFGROUP** enjoyed healthy and stellar reputations and at all material times planned to expand further into the industry and cultivate business opportunities throughout the world in future, using its brand and the group's collective reputations.  (*Id.* ¶¶ 40-41).

     As a further component of their expansion plans, **MF** and/or **MFSA** entered into contracts with independent contractor representatives in many countries around the world (hereinafter "Representatives"), including, but not limited to, the United Kingdom, Czech Republic, Switzerland, Peru, Ecuador, Brazil, Singapore, Cyprus, Israel, Dubai, Thailand, Guatemala, Chile, and the United States of America (Florida). (*Id.* ¶ 42).  Representatives were independent contractors separate and apart from **MF** and/or **MFSA**, who were permitted exclusive rights to purchase and thereafter sell **MF** and/or **MFSA's** products and services, to newly acquired and/or existing **MFGROUP** original clients within specified jurisdictions, in exchange for fees and/or specified commissions agreed to between the parties.  (*Id.* ¶ 43).  They were permitted to use variations of the **MFGROUP** names, along with **MFSA's** logos in conducting and developing their own businesses.  (*Id.* ¶ 44).  Representative contracts generated significant income:  using **MFGROUP** names and logos, Representatives facilitated

MFGROUP's branding efforts internationally and enhanced its worldwide reputation. (*Id.* ¶¶ 47-48).  In short, MFGROUP invested heavily in branding its products and trademarked a logo in connection therewith based upon important profit maximizing business considerations.

### C.   *The Hack and Resulting Panama Papers Scandal*

In 2015, an anonymous whistleblower hacked 11.5 million MFGROUP attorney-client privileged documents, and then sent the stolen documents to German journalist Bastian Obermayer at the Suddeutsche Zeitung.  These documents, commonly referred to as the "Panama Papers," purportedly included information about many rich and famous people in both the private and public sectors, and made reference to over two-hundred-thousand (200,000) offshore entities created by Plaintiffs and/or any of them.  (*Id.* ¶¶ 49-50).  The hack is notoriously referred to as the "Panama Papers" scandal.  The "hack and release" information confirmed that only an "extremely minute" percentage of offshore corporations created by MF and/or MFSA appeared to have been utilized by some UEUs for criminal activity including, but not limited to, money laundering, tax evasion, bribery and/or fraud.  (*Id.* ¶ 53).  Contrary to the Defendant's assertion that the Plaintiffs acknowledged "some number" of such uses (*See* Def's Motion for Judgment on the Pleadings Pursuant to 12(c) at p. 3, ll. 2-5 (hereinafter cited as "Def's Brief")), Plaintiffs have cited an "extremely minute" number that were only "apparently utilized" *specifically* by UEUs.  (SAC ¶ 53). Significantly, none were "clients" of MFGROUP.  The "skip over" of this point by Defendant in its memorandum is consistent with the Defendant's failure to perceive why its movie is replete with criminal innuendo.  The film's innuendo and implications converge to suggest that these lawyers/law-firms were catering to criminal "clients" and facilitating illegal activities.  In fact, MFGROUP catered to original professional/institutional clients only and not UEUs.  (*See generally* SAC ¶¶ 27-31).

Based upon the Panama Papers, author Jake Bernstein wrote a book called "Secrecy World."  While he writes a book about offshore companies and banking

systems and the Plaintiffs acknowledge speaking to him, there was no collaboration between the author and Plaintiffs as suggested by the Defendant in its memorandum (Def's Brief, p. 3).  Moreover, any interviewing was clearly about his "book" and not the Defendant's trailer or movie based on the book, which are the relevant subject matters of this case.  The fact that Bernstein spoke to the Plaintiffs or texted them is utterly immaterial to whether the Defendant defamed them, or wrongfully diluted their trademarked logo.  He was not given authority or permission to use the likeness of either **MOSSACK** or **FONSECA** in his book, and certainly did not have an agreement pertaining to the use of their images and personalities in the Defendant's movie.  Likewise, with respect to the Plaintiffs' intellectual property.  Most assuredly, nobody was given permission to defame the Plaintiffs regardless of whether Plaintiffs ever spoke or complained to Bernstein.  This is all irrelevant to the issue at hand, and Bernstein's interest in supporting the Defendant is not surprising;  there can be little doubt that he has a monetary interest, possibly even a legal interest, in defending **NETFLIX** against the Plaintiffs' libel and libel *per se* claims.

### D. *"The Laundromat:  Trailer and Movie Use of the Logo*

The trailer at https://www.youtube.com/watch?v=wuBRcfe4bSo, contains opening clips stating the movie is "based on some real shit" and several screens appear asking the question "how do 15 million millionaires in 200 countries stay rich . . . [answer] with lawyers like these," followed by a screen shot of Oldman and Banderas portraying **MOSSACK** and **FONSECA** as antagonist villains dressed in flashy tuxedos.  Famous academy award winning actress Meryl Streep, playing recently widowed Ellen Martin who lost her beloved husband on a fall boat tour, is portrayed as the film's main protagonist pursuing justice after being told by her own lawyer that her *de minimis* settlement with a tour operator was related to a recent change in her insurer.  Essentially, her new offshore insurance company was defunct, if it ever existed, and Streep's actor lawyer states "so there is confusion over who has to pay."

The trailer, like others designed to attract future moviegoers and boost sales,

follows the "confusion" comment with Ellen responding to the lawyer: "so they drown you and 20 twenty other innocent people," while another background voice adds "and somebody's making money off it."  The dialogue spans clips of Streep mourning at a funeral, then reverting back to her lawyer's office where she is given her settlement check and told by her lawyer: "and it all goes back to this law firm Mossack Fonseca." Shortly thereafter there is a clip depicting Streep and her in-film daughter pushing a cart in a grocery store, providing the functional equivalent of an answer to what exactly all goes back to this law firm:  namely, "bribery, corruption, money laundering, millions and millions and millions of dollars," as the scene pans away to a clip showing a "download" of hacked "Panama papers" in progress at "508, 905" of "11, 528, 218." Of course, the files being downloaded are the notorious 11.5 million hacked documents that became the "Panama Papers."  Clearly, the script is designed to associate the Plaintiffs with the crimes mentioned only seconds before.

The very famous "download" frames are followed by Banderas being bombarded with ringing and beeping of multiple phones.  Immediately thereafter, other clips of people apparently connected to offshore accounts through the law firm of Mossack Fonseca exclaim "shit" and/or other expletives in different languages, including an English speaking lady at a bar, a gentlemen dressed in garb resembling a Sheik, two Russian gangsters, and the wife of a Chinese politician driving by some soldiers.  The clear implication is that all of these people are associated with criminal activity, and the Plaintiffs have been "outed" in the "hack and release" of the firm's confidential client information. The final seconds of the trailer depict Oldman and Banderas in a Board Room in front of a huge flat screen television projecting a still screen shot of the **MF** logo as the two actors look at each other with astonishment, bearing "we've been outed" expressions.



The implications and innuendo converge to cast Plaintiffs in the light of mastermind criminals whose crimes include, but are not limited to, murder, bribery, money laundering and/or corruption.  This is what the viewer will associate with Plaintiffs' logo after seeing the film.

The trailer commentary sets the stage for a main theme that imputes criminal activity to **MOSSACK** and **FONSECA** and their law-firm, in the film proper, which unfolds a tale of the two lawyers entrenched in money laundering, tax evasion, and other felonious crimes, implying they are co-conspirators and/or facilitators of crimes committed by purported "clients," with whom none of the Plaintiffs ever enjoyed an attorney-client relationship.  Failure to clarify the relationship between the Plaintiffs and criminals forms a central basis for the defamatory innuendo and false light portrayal of the two.  The Defendant knows full well the Plaintiffs enjoyed no such relationship with criminals, as does Mr. Bernstein who "thoroughly researched" his book.  Clearly, the Defendant also knows that the criminal activity depicted in the film does not "all go back to this law firm Mossack Fonseca" as purposely suggested in the trailer, paving the way for a viewing audience to believe that **MOSSACK** and **FONSECA** are at the center of criminal activity and/or assisting clients who are involved in the same. The Defendant conveniently ignores the fundamental distinction addressing the "client" misnomer;  namely, the "end user" distinction and facts that clearly demonstrate the

1   Plaintiffs never had "clients" in the manner imputed to them in the trailer/movie.

2   Rather, their products were sold to banks, lawyers and other professionals.  (*SAC* ¶

3   123).

4         In the course of the trailer and the film, the Defendant utilizes the Plaintiffs'

5   already public, famous and/or notorious trademarked logo in disparaging ways.

6   The trailer and movie incorporate a trademarked logo which is registered in Colombia

7   and protected under the 1929 General Inter-American Convention for Trade Mark and

8   Commercial Protection, a self-executing Treaty, wherein both Colombia and the United

9   States are member States, and wherein member states are authorized to pursue

10  protection and infringement claims using the legal system in the member State of the

11  offending party.  (*Id.*  ¶¶ 123-124).  Defendant's trailer and movie utilize the logo

12  unnecessarily, placing it in scenes that allow the viewer to associate it with very serious

13  criminal and unethical behavior.  In doing so, the Defendant infringes upon the

14  protected logo, disparaging and tarnishing the same for no necessary or colorable

15  artistic purpose, or other constitutional benefit of expression.  The logo is used

16  approximately 8 times between the trailer and the movie proper, exposed on the side of

17  a building, on a client folder, twice behind a transparent door in an office, on a

18  background re-broadcast of a CNN news segment, and three times in scene

19  backgrounds projected on large screen televisions, including one instance lasting

20  approximately 30 seconds.  (*Id.* ¶ 123).

21        Clearly, the Defendant used the logo in its trailer to attract moviegoers as well as

22  generate revenue and, in the movie, to benefit economically from the reality the logo

23  lends to the scenes;  it brands the Plaintiffs and their businesses with criminality, instead

24  of sentiments of goodwill and professionalism that the logos are intended to conjure up.

25  Defendant's use is not incidental.  The manner in which the Defendant deploys the logo

26  produces a mental association in viewers that would be unsavory, damaging, and/or

27  unwelcomed by the Plaintiff owners of the logo.  In this manner, the Defendant has

28  diluted and falsely advertised the logo.  At the hands of the Defendant, the Plaintiffs are

1   further catapulted to the status of poster children for offshore financial wrongdoings,

2   money laundering and tax evasion, complete with a logo that the Defendant ensures will

3   guarantee mental association with crime and corruption.

4   **III.   LAW AND ARGUMENT**

5        **A.   *Legal Standards***

6             **i.   *Standards upon 12(c) Motion for Judgment on Pleadings***

7        Judgment on the pleadings is generally evaluated upon the same legal standards

8   as dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be

9   granted." (*See e.g.*, *Marrero v. Patterson*, 2018 WL 4207261, at *3 (N.D. Cal. Sept. 4,

10  2018) (citing, 525 F. Supp. 2d 1158, 1160 (N.D. Cal. 2007)).  In reviewing a motion to

11  dismiss for failure to state a claim, a court may only consider the complaint, documents

12  incorporated by reference in the complaint, and matters of judicial notice.  (Fed. R. Civ.

13  P. 12(b)(6); *Gonzalez v. Law Office of Allen Robert King*, 195 F. Supp. 3d 1118 (C.D.

14  Cal. 2016)).  "The question presented by a motion to dismiss is not whether the plaintiff

15  will prevail in the action, but whether the plaintiff is entitled to offer evidence in

16  support of its claim." (*See Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F.

17  Supp. 2d 890, 896 (C.D. Cal. 2014) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,

18  511 (2002);  *see also United States v. White*, 893 F. Supp. 1423, 1429-30 (C.D. Cal.

19  1995) (stating "defendants have confused pleading with proof" and denying motion to

20  dismiss that was based in part on failure to allege adequate factual support for claims)).

21  At this early stage of the proceedings, Plaintiffs are not required to prove their claims.

22  Rather, Plaintiffs must only plead plausible facts in support of their pleadings.

23  Moreover, the motion is viable only where the moving party clearly establishes on the

24  face of the pleadings that no material issue of fact remains to be resolved, and that the

25  movant is entitled to judgment as a matter of law.  (*See Hal Roach Studios, Inc. v.*

26  *Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989)).

27       Thus, "[t]he standard for judgment on the pleadings is stringent," such that "[a]

28  motion for judgment on the pleadings should be denied unless it appears to a certainty

that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim." (*See Mostowy v. United States,* 966 F.2d 668, 672 (Fed. Cir. 1992); *Arc Ecology v. United States Dep't of the Air Force*, 411 F.3d 1092, 1096 (9th Cir. 2005) (stating same, as to 12(b)(6) motion to dismiss); *accord*, *Carson Harbor Village Ltd. v. City of Carson,*37 F.3d 468, 472 (9th Cir. 1994)). "The stringent requirements for the granting of a rule 12(c) motion for judgment on the pleadings are wholly consistent with the general disfavor in which all motions for summary disposition of cases are treated in federal courts." (*See Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F. Supp. 1065, 1071 (E.D. Pa. 1982)).

Here, the Plaintiffs' obligation is limited to providing a basis for being entitled to relief, that goes beyond mere labels and "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (*See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Iqbal*, 550 U.S. at 678; *see also Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO, 2015 WL 1526590, at *3 (C.D. Cal. Mar. 17, 2015) (denying motion to dismiss)). Notably, the "plausibility" standard is not akin to a "probability requirement." (*Iqbal*, 556 U.S. at 678).

Mechanistically, a Court considering a motion pursuant to Rule 12(b)(6), must accept as true all material allegations in the complaint, including all reasonable inferences to be drawn therefrom, and construe the same in the light most favorable to the non-moving party. (*See Iqbal*, 550 U.S. at 678; *and also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1340 (9th Cir. 1995)). Against this backdrop, the complaint does not require detailed and specific factual allegations as long as it provides the defendant with fair notice of the claim and the grounds upon which the claim rests. (*Iqbal*, 550 U.S. at 678; *Twombly*, 550 U.S. at 555; *accord Kythera Biopharm., Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 896 (C.D. Cal. 2014) (denying motion to dismiss trademark

claims);  *CYBERsitter, LLC v. Google Inc.*, 905 F. Supp. 2d 1080, 1085-86 (C.D. Cal. 2012) (similarly denying motion to dismiss trademark claims)).  Thus "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  (*Twombly*, 550 U.S. at 556).

Importantly, since a Rule 12(c) motion is "functionally identical" to a Rule 12(b)(6) motion to dismiss for failure to state a claim, leave to amend should be freely granted unless amendment would be futile.  (*See Pac. W. Group, Inc. v. Real Time Solutions*, 321 Fed. Appx. 566, 569 (9th Cir. 2008) (quoting *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989));  *Moran v. Peralta Cmty. Coll. Dist.*, 825 F. Supp. 891, 893 (N.D. Cal. 1993)).  Here, while the Plaintiffs were required to amend their first Complaint in relation to Jurisdictional motions advanced by Defendant in the District of Connecticut, the substantive allegations in Plaintiffs' SAC remained the same.  The SAC, therefore, is the functional equivalent of an original or first Complaint. Accordingly, in the event that this Court finds any claim to be insufficiently pled, Plaintiffs would request leave to amend to address the insufficiency.

Notably, when ruling on a motion to dismiss, a court must normally convert a motion to dismiss for failure to state a claim into one for summary judgment if the court considers evidence outside of the pleadings;  Rule 12(d) provides that, if this Court decides to consider extrinsic materials it must then convert the pending motion to a Rule 56 motion for summary judgment.  Should the Court choose to do so, however Rule 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

In short, Rule 12(d) affords the non-moving party discovery to which they would otherwise be entitled in opposing a Rule 56 motion.  Of course, a court may grant

a summary judgment motion only after the nonmoving party is afforded "adequate time for discovery."  (*See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that a plain reading of Rule 56(c) mandates that the nonmoving party be given the opportunity to conduct a full range of discovery);  *see also*, *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1105-1106 (9th Cir. Cal. 2000) (stating party "must have had sufficient time and opportunity for discovery")).

Lastly, Rule 12(c) cannot be used to circumvent the requirements and parameters governing defenses:  "it *cannot be used* to assert Rule 12(b) defenses *that* have not been *raised previously* in the pleadings or by preliminary motion . . . .  [or] they quite appropriately will be deemed to have been *waived by non-assertion* in timely fashion."  (*See* 5C Wright & Miller, Federal Practice and Procedure § 1367 (3rd ed. 2004) (emphases added)).  Such a waiver alone would be sufficient to deny the motion outright.

### ii. *Defendant's Memorandum Introduces Extrinsic Evidence*

Here, Defendant introduces extrinsic evidence in the form of facts and opinions interjected into its brief and/or advanced for the first time therein.  In addition, Defendant's motion appears to broach defenses that were not pled in Defendant's Answer with respect to the Fourth and Fifth Counts of the SAC.  And clearly, Defendant's memorandum attacks the insufficiency of Plaintiff's allegations.

### iii. *Plaintiffs Should Be Afforded Discovery and/or the SAC Can Be Amended to Address any Insufficiency in the Pleadings*

Plaintiffs respectfully submit that if this Court follows Rule 12(c) standard, disregards all extrinsic evidence and/opinion interjected by the Defendant, and takes all of the SAC's allegations as true including reasonable inferences stemming therefrom, and construing the same in the light most favorable to the Plaintiffs, the Defendant's motion should be denied.  If, however, the Court intends to consider any extrinsic evidence interjected by the Defendant, including facts and opinions emanating from Defendant's brief and/or elsewhere by reference, the Defendant's motion must be

examined as and/or converted to a Rule 56 Summary Judgment Motion, and Plaintiffs must be afforded a full range of discovery under the FRCP, with an opportunity thereafter to present this Court with a more fully developed response.

And while not conceding the same here, any insufficiency in pleadings recognized by this Court is remediable by way of amendment.  The standard for granting leave to amend is generous."  (See *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (reversing trial court's denial of request to amend complaint)).  Dismissal without leave to amend is appropriate only when the court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment.  (See *Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1058 (C.D. Cal. 2014) (allowing amendment)).

**B.** **Claims in Count IV and V are Properly Pled**

    **i.** ***Plaintiffs Can Establish Trademark Dilution Alleged in Count Four***

        **(a)** ***Elements of Dilution by Tarnishment***

In order to prove a violation under trademark dilution law, a plaintiff must show that: "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) defendant's use of the mark is *likely to cause* dilution by blurring or dilution by tarnishment."  (See *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008)(emphasis added)).  Federal law does not require a likelihood of confusion to succeed on a dilution claim.  (See *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004); *see also Levi Strauss & Co. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1172 (9th Cir. 2011) (marks need not be identical for dilution to occur)).

None of these elements are disputable except the "famousness" element, which is addressed *infra*.  **MFSA's** logo is protected under the Lanham Act because the Act

incorporates the 1929 General Inter-American Convention for Trade Mark and Commercial Protection.  Proof of the logo's use is satisfied by **NETFLIX's** display of the same in its movie, no less than eight (8) times.  The mark was used in commerce in connection with the sale and advertising of goods, in that it was displayed in **NETLIX's** trailer to attract moviegoers.  It was also used in the movie proper.  It has been aired at two film festivals, and was streamed into the homes of millions of **NETFLIX** subscribers beginning on October 18, 2019.  The logo was previously used exclusively by **MFSA** in commerce, upon marketing materials, documents, client development gifts, and on website(s) used by **MFSA**.[1]  **MFGROUP** has expended many thousands of dollars developing its logo, branding its service, and using the logo, over many years.  It belonged to a very successful and dominant force in the offshore legal-service industry, and has been seen by thousands of people worldwide on products, at seminars, the firm's website, and on the side of an office building in Panama City.  Additionally, **MFGROUP** has branded items and promotional materials used throughout the world in marketing services and developing its brand, in offices in Latin America, the United Kingdom and the United States.  The mark clearly has been used by **MFSA** before **NETFLIX's** junior infringing use began. Notably, the same has all been alleged clearly and sufficiently in the Plaintiffs' Complaint.  (*See e.g.,* SAC ¶¶ 5-7, 11, 19, 34-48, 75, 83, 107, 112, 121-127, 169-79, and 184).

The gravamen of **NETFLIX's** use of the protected logo, is primarily the negative association and resultant loss of goodwill and reputational harm occasioned by the unpermitted use.  This is a legally cognizable claim know as dilution by "tarnishment."  Under § 1125(c)(2)(c) tarnishment is the "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  (*Id*.)  The Ninth Circuit has stated that dilution by tarnishment occurs when the mark is linked "with something unsavory or degrading."  (*See Toho Co. v.*

---

[1] Ventura Affidavit at ¶ 22.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

*Sears, Roebuck & Co*., 645 F.2d 788, 790, 793 (9th Cir. 1981) (refusing Plaintiff's tarnishment claim where Sears' use of the "Bagzilla" mark on "Monstrously Strong" garbage bags failed to tarnish the "Godzilla" mark absent linking the same with something "unsavory" and/ or "degrading")).

When criminal activity, including money laundering, tax evasion, insurance and wire fraud, and bribery, are being attributed to **MOSSACK** and **FONSECA** in a movie called the "The Laundromat" or "La Lavandería," it is difficult to deny anything less than an "unsavory," or "degrading" association with the mark. This is especially apparent at one point when the mark is being broadcasted behind **MOSSACK** and **FONSECA** (trademark namesakes whose real names are also being used in the film) for 30 seconds in a movie intimating a message that crimes including money laundering, bribery and corruption "all go back to this law firm Mossack Fonseca." The logo is as much defamed as **MFGROUP**, and viewers are likely to associate the logo *not* with the existing goodwill generated by **MFGROUP's** efforts in marketing and branding, but with the criminal accusations heralded in the Defendant's movie.

The only real basis for challenge on the elements by the Defendant is the extent to which the logo is "famous" and clearly, in ignoring the effect of the Plaintiffs' enforcement rights under the Treaty, the Defendant has given short shrift to an element that is tamed by the case law in the Ninth Circuit in a manner that makes a factual inquiry necessary. The "famousness" element is arguably not ripe for determination as a matter of law, via Judgment on the Pleadings.

### *(b) Inter American Convention; Foreign Marks and "famousness"*

**MFSA** owns a registered trademark in Colombia, protected under the 1929 General Inter-American Convention for Trade Mark and Commercial Protection (hereinafter the "Convention").[2]  As a Southern District Court in New York

---

[2] *See* SAC ¶ 36 & Affidavit of Arthur Ventura Jr. ¶ 22.

acknowledged: "[t]he Inter-American Convention, is a self-executing treaty, and thus it became law in the United States without the necessity for implementing legislation." (*See Havana Club Holding, S.A. v. Galleon*, S.A., 62 F. Supp. 2d 1085, 1092 (S.D.N.Y. 1999)), *cert. denied, Havana Club Holding, S.A. v. Bacardi & Co.*, 531 U.S. 918 (2000) (*citing Bacardi Corp. of America v. Domenech,* 311 U.S.150, 161 (1940)).  The Trade Mark Trial and Appeal Board further noted that while it had the same force of federal law, it was actually independent of the Lanham Act.  (*See British-American Tobacco Co. Ltd. v. Philip Morris Inc.,* 55 U.S.P.Q.2d 1585, 2000 WL 1005433 (T.T.A.B. 2000)).  Notably, both Colombia and the United States of America are Member States under the Treaty, thus both are authorized to pursue protection and infringement claims using the legal systems in the Member State of the offending party.

Article 7 of the 1929 General Inter-American Convention for Trade Mark and Commercial Protection states in relevant part:

> Any owner of mark protected in one of the Contracting States in accordance with its domestic law, who may know that some other person is using . . . an interfering mark in any other of the Contracting States, shall have the right to oppose such use  . . .  and shall have the right to employ all legal means, procedure or recourse provided in the country in which such interfering mark is being used . . .  and upon proof that the person who is using such mark . . .  had knowledge of the existence and continuous use in any of the Contracting States of the mark on which opposition is based upon goods of the same class the opposer may claim for himself the preferential right to use such mark in the country where the opposition is made . . . upon compliance with the requirements established by the domestic legislation in such country and by this Convention.

(*Id*.)  Thus, a showing of (1) ownership and (2) proof that the junior user of the logo knew of the existence and continuous use of the mark in "any" contracting State, would allow the owner preferential rights of use "in the country," and permit the owner all "legal means, procedure or recourse" to protect and enforce the same.  **NETLIX** clearly knew that the Plaintiffs previously and continuously used their the logo, and in an effort to compliment a false message with an attribute of reality, it used the international mark in its unaltered form as a backdrop to scenes in the film wherein **MOSSACK** and

**FONSECA** are defamed and cast in the false light of criminality.

The language in the Lanham Act appears to grant Member State Plaintiffs rights eve more extensive than U.S. law would otherwise provide, where necessary.  For example, Section 44 (b) of the Lanham Act provides:

> Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter.

15 U.S.C. § 1126 (2000) (addressing international conventions and foreign mark registration in the U.S.)).

As noted above, Defendant's analysis of Plaintiffs' Trademark claims does not address the Treaty;  conveniently, the self-executing law is glossed over in favor of the more restrictive Lanham Act element of "famousness."  The rights granted to Foreign mark holders under the Treaty and the Lanham Act read together, is conveniently and completely ignored by Defendant.  Notably, however, the elusive and rarely attainable element of "famousness" may not be required for Plaintiffs to sustain their Trademark Infringement claim as Treaty Members.  Interestingly, California federal Courts appear to acknowledge the same.

In the Ninth Circuit, the "well known" exception to the "famousness" element was acknowledged in a Los Angeles case, where a Mexican Grocery Store chain sought to protect its mark from being exploited by an unrelated U.S. entity in Southern California.  (*See Grupo Gigante SA De CV v. Dallo & Co., Inc*., 391 F.3d 1088, 1108 (9th Cir. 2004)).  The Court found that federal law recognized an exception to the normal famousness/territorial rule.  In holding the same the Court stated:

> We hold … that there is a famous mark exception to the territoriality principle. While the territoriality principle is a long-standing and important doctrine within trademark law, it cannot be absolute. An absolute territoriality rule without a famous mark exception would promote consumer confusion and fraud.

> Commerce crosses borders. In this nation of immigrants, so do people. Trademark is, at its core, about protecting against consumer confusion and "palming off." There can be no justification for using trademark law to fool immigrants into thinking that they are buying from the store they liked back home.

(*Id.* at 1094).  Likewise, there is no reason to fool the general public into believing that **MOSSACK** and **FONSECA** are criminals and that their law firms were simply repositories for laundered money and crime.

Unlike the District Court in Los Angeles, the Ninth Circuit held that while Grupo Gigante was sufficiently well known in Southern California, and its mark had a possible "secondary meaning," this level of notoriety was insufficient.  The Court stated that the requisite level of notoriety for mark recognition was familiarity and knowledge by a "substantial percentage" of people in the appropriate American market;  essentially, it had to boast an "intermediate" level of familiarity that was greater than "secondary meaning," but not as demanding as the "famousness" requirement under the Lanham Act.  (*Id.* at 1106).

Notably, the Ninth Circuit held that in deciding whether a mark met the "well known" threshold, a court could consider "intentional copying" and whether confusion about products or services being bought from an affiliate of the foreign owner was likely.  On the first consideration, the logo clearly didn't get into the Defendant's film by accident and there can be little doubt that **NETFLIX's** copying was "intentional." On the second consideration (Translated into Dilution by Tarnishment lexicon), the question is whether a viewer would be confused about the nature of **MFGROUP's** services—are they a law firm of world leaders in the offshore company creation business or are they the criminals that **NETFLIX** portrays them as either directly and/or by innuendo?  Ultimately, the Plaintiffs' position is that **NETFLIX's** use of the mark generates a confusion for viewers both as to whether or not the Plaintiffs have sponsored or approved the message of the film, and as to whether the Plaintiffs are offshore legal experts or outright criminals engaged in money laundering and financial

crimes.

The intentionality and/or confusion considerations prescribed by the Ninth Circuit both require factual inquiries and determination of the same at a summary juncture is not appropriate.  In fact, the appellate court in *Giante, supra,* actually remanded the case to the District court for factual findings related to establishing a "well known" mark claim.  In short, the issue of how "well known" **MFGROUP's** mark is, turns on factual inquiries and not determinations as a "matter of law" ascertainable from pleadings alone;  more discovery and evidence extrinsic to the pleadings would be required.

Consequently, the Defendant's motion to strike the **FOURTH COUNT** of the SAC should be denied and/or the Court should order discovery and revisit the claim if the Defendant's advance a Rule 56 Summary Judgment motion.

### *(c) Defendant's other Trademark Defenses Are Untenable*

#### *1. Disclaimer Is Insufficient and Used Inconsistently*

Defendants argue that its "disclaimer" can cure its otherwise defamatory statements and/or innuendo.  The disclaimer cited by the Defendant (Def's Brief. p. 4) (identified as appearing at the 1 hour, 34 minute, 25 second mark of the movie) states:

> While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue, and names are fictionalized for the purpose of dramatization. As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history.

Clearly its disclaimer does not specifically state that the **MOSSACK** and **FONSECA** characters in the film are not criminals and have not been convicted of any crime alleged by implication/innuendo in the trailer and/or movie.  It certainly doesn't say that the movie has *not* been prepared, approved, or licensed by Plaintiffs.  The type of disclaimer used by the Defendant is insufficient to reduce disparagement and/or confusion as to authorization or source, and on that basis it cannot be used as a defense

to infringement.  By the time it surfaces in the movie, the innuendo cat has been out of the bag for an hour and a half;  this is a significant time for a viewer to be bombarded with false accusations about the Plaintiffs.  Moreover the disclaimer is used inconsistently.  It doesn't appear in a trailer that alleges the film is based on some "real shit," which is incommensurate with Defendant's characterization of the **MOSSACK** and **FONSECA** characters as fictional and farcical components of a straight-forward satire.  Nothing could be further from the truth.  Notably, where disclaimers are not employed consistently, in all advertising and promotional materials, "the effectiveness ... is undercut by [] contradictory messages."  (*See Au-Tomotive Gold*, *Inc. v. Volkswagen of America, Inc.,*  457 F.3d 1062, 1077 (9th Cir. 2006) (finding disclaimers ineffective where products were sold on a website that was not consistent with the disclaimers);  *see also Toho*, 33 F. Supp. 2d at 1213 (noting that internet advertising did not employ the disclaimer in question, and granting preliminary injunction)).

## 2.  *Defendants are Using Plaintiffs' Logo as a Trademark*

It is unclear how the Defendant means to assert "non-trademark use."  Further it is not pled in the Defendant's answer.  At a minimum, the Plaintiffs adequately plead dilution, and their trademark claims should not be resolved by way of motion to dismiss.

Without conceding the Defendant's argument is appropriate here, it is clear that Defendant uses the logo as a trademark, and Defendant cannot escape Plaintiffs' dilution claim on account of "non-trademark" use, even if the same were pled in the Defendant's Answer.

The analysis is straightforward;  the TDRA provides for relief where a person "commences use of a mark or trade name in commerce that is *likely to cause dilution*." 15 U.S.C. § 1125(c)(1) (emphasis added).  Pursuant to 15 U.S.C. § 1127, "[t]he term 'mark' includes any trademark, service mark, collective mark, or certification mark."  Dilution by tarnishment is one type of dilution;  it involves damage to reputation and good will.  Under § 1125(c)(2)(c) tarnishment is the "association

arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." (*Id.*).  The Ninth Circuit has stated that dilution by tarnishment occurs when the mark is linked "with something unsavory or degrading." (*See Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 790, 793 (9th Cir. 1981) (refusing Plaintiff's tarnishment claim where Sears' use of the "Bagzilla" mark on "Monstrously Strong" garbage bags failed to tarnish the "Godzilla" mark absent linking the same with something "unsavory" and/ or "degrading")).  Tarnishment occurs when a famous mark is used for poor quality products or services or is used in a manner which is unwholesome or demeans the character of the trademark owner.  (*See Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316, 1326 n.7 (9th Cir.1998)).  Associating the mark with unsavory sentiment and degrading the mark by implicating it with criminal activity, including money laundering, tax evasion, insurance and wire fraud, and bribery, is commencing use "likely to cause dilution," and to demean the character of the trademark owner.

### 3. *"Non-Commercial" Use Is not Raised in the Defendant's Answer*

Defendant's argument that use of the Plaintiffs' logo in its movie constitutes "non-commercial use" is not pled in the Answer to the SAC, and should not be considered here.  At a minimum, the Plaintiffs adequately plead dilution and their trademark claims and the same should not be resolved by way of motion to dismiss. Therefore, Defendant's non-commercial use argument should not be considered, and should not form the basis of a summary decision under Rule 12(c), least of all prior to discovery.

### 4. *Defendant's "Road Kill" Theory of Damages Is not Rooted in Reality*

Plaintiff's do not admit that their mark is already tarnished beyond repair, as suggested by the Defendant;  **NETLIX** argues that a host of factual assertions about the effect of the Panama Papers hack and release, amounts to an admission that the Plaintiffs' mark is so thoroughly damaged that it cannot be damaged any further.  (See

Def's Brief at p. 10).  At best this is an opinion, albeit an erroneous one, based upon SAC allegations cited in support of the claim.  Certainly, the Court cannot conclude the same, as a "matter of law."  Moreover, the Defendant deploys faulty assumptions and a disconnection from reality in asserting its "road kill" theory.  When something is damaged most people try and fix it;  the same holds true for personal and business reputations.  They are not forever damaged, simply because they suffer damage at some point;  moreover, permanent and irrecoverable damage is a question of fact and/or opinion.

The "road kill" argument misses the point that people can resurrect their reputations and their businesses after being defamed.  In fact, it would be natural to do so.  Even where business reputations and/or goodwill have been damaged in the past, the owners of the same are entitled to protect against complete obliteration and/or salvage what might otherwise remain.  For example, *permanent* loss of clientele occasioned by damage to goodwill, is something **MFGROUP** is entitled to guard against.  (*See e.g.*, *Fairfield County Medical Assoc., v. United Healthcare of New England,* 985 F. Supp. 2d 262 (D. Conn. 2013) (citing *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994) (citing protection against permanent loss of customers due to the loss of goodwill) (emphasis added), *and Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 867 (8th Cir. 1977) (same)).  Thus, the Plaintiffs have interests not only in preventing loss of customers, but "permanent" loss of customers due to loss of goodwill and/or unsavory association with their trademarked logo.

On the heels of an acquittal or if allegations are otherwise shown to be false in future, **MFGROUP** would certainly be entitled to "pick up the pieces," based upon previous misperceptions and/or their innocence coming to light.  **NETFLIX's** movie places unnecessary and unwarranted burdens upon **MFGROUP's** future business opportunities and ability to prevent permanent loss of goodwill and clientele, by generating unsavory associations with its logo.  Here, the SAC sufficiently sets forth the

reputational and other damages/harms suffered by Plaintiffs due to trademark dilution. Defendant's postulation of unrecoverable reputations either as persons, or as applied to Plaintiffs' mark and its goodwill, is absurd.

### ii.    *Plaintiffs Can Prevail on their Federal False Advertising Claim*
### (a) *Elements of Plaintiffs' False Advertising Claim are Established*

The elements of a false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a) are:  (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;  (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;  (3) the deception is material, in that it is likely to influence the purchasing decision;  (4) the defendant caused its false statement to enter interstate commerce;  and (5) the plaintiff has been or is likely to be injured as a result.  To be sure, the Plaintiffs have sufficiently alleged facts in support of all elements in the SAC, including all of the allegations pertaining to Libel, Libel *Per Se*, and False Light, and including, but not limited, specific allegations about logo use and value.  (*See* SAC generally*, and*  ¶¶ 5-7, 11, 19, 34-48, 75, 83, 107, 112, 121-127, 169-79,b184 (referring specifically to logos and trademarks)).

The trademark and statements are contained in the trailer, which is clearly an advertisement designed to attract viewers.  The fact that **NETFLIX** portrays the Plaintiffs as criminals and/or in the false light of criminality in the provision of their services as overseas lawyers, at a minimum, establishes element number (1).  If believed, and as alleged in the SAC, the statements will deceive the viewing audience into believing that the Plaintiffs are criminals and/or involved in criminal activities themselves and/or in conjunction with clients they serve.  Thus, element (2), for these and other reasons is established.  If believed, and as alleged in the SAC, the viewing audience would not be inclined to engage the services of **MFGROUP** as they are portrayed in the trailer and the movie.  Therefore, for these and other reasons, element

(3) is established.  As alleged, and admitted by the Defendant, the trailer and movie have been streamed on the internet and on Defendant's own platform to millions of subscribers.  For these and other reasons, element (4) requiring the causing of statements to enter the stream of commerce appears uncontestable.  Lastly, element (5) referring to likely injury has been met by the allegations in the SAC.

Certainly, the question of whether all elements are met may be subject to disagreement between the parties, however, this would only justify the denial of Defendant's motion at this summary stage in favor of permitting the Court to consider extrinsic evidence and/or facts developed in discovery.  Clearly the Defendant disagrees that the Plaintiffs assert a colorable False Advertising claim, however, they do not straight forwardly address the elements, in favor of a First Amendment challenge to the Plaintiffs claims.

### (b) *Defendant's Rogers Argument Is Unavailing*

The First Amendment must be reconciled with intellectual property rights asserted in the context of Lanham Act claims, and the current body of case law governing this reconciliation offers no easy analyses. If it were as easy as citing one case, or one proposition, one might quote the Supreme Court of the United States opining that "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public," and the government may even ban "forms of communication more likely to deceive the public than inform it."  (See *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-63, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)).  But the analysis is not that simple, especially in what might be characterized as a body of trademark related case law that could use some clarification.  The Defendant clearly believes and argues that First Amendment interests outweigh the Lanham Act trademark rights active in the Plaintiffs' False Advertising claims.

In support of its First Amendment argument, Defendant cites *Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir. 1989) ("hereinafter "*Rogers*"), as the basis for

1   Plaintiffs' inability to prevail on their Federal False Advertising claim.  Upon closer

2   scrutiny, however, it appears that *Rogers* may not be as controlling as the Defendant

3   asserts.  Certainly, *Rogers* does not stand for the proposition that the First Amendment

4   automatically trumps trademark rights;  rather, it is meant to embody a balancing act

5   between the public interest in artistic work and the public interest in avoiding consumer

6   confusion.  (*See Gordon v. Drape Creative, Inc.*, 897 F.3d 1184, 1190 (9th Cir. 2018)).

7   *Rogers* was a "title" case, and did not involve dilution by tarnishment or an extensive

8   review of a Lanham Act False advertising claims related to trademark placement in a

9   movie.  Clearly, a different analysis is warranted where the focus is shifted from the

10  "title" of a movie, to multiple placements of a protected Foreign trademark in a film

11  that defames the mark owners directly and/or by innuendo, by portraying them as

12  criminals.  Logically, the balancing implicit in *Rogers* on this score can and should be

13  extended to include weighing public interest in a movie's message against the danger

14  that the use of the trademarked logo will cause an "unsavory" or "negative" association

15  with the products and/or services of the senior user.  The manner in which the balancing

16  ought to take place is the subject of Ninth Circuit and other decisions.

17        The Ninth Circuit held in *Gordon* that "the use of a mark alone may explicitly

18  mislead consumers about a product's source if consumers would ordinarily identify the

19  source by the mark itself."  (*See Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 270 (9th

20  Cir. 2018)).  In remanding the case to the Trial Court, the Ninth Circuit noted that the

21  defendant's use would be "explicitly misleading," if a jury could find the defendant

22  "simply used Gordon's mark with minimal artistic expression of their own, and used it

23  in the same way that Gordon was using it."  (*Id.* at 271).  Gordon signals a move away

24  from the *Rogers* test.  In a case examining *Gordon's* import, in determining whether to

25  follow *Rogers'* two prong test, the District Court in *Stouffer* agreed that the Lanham Act

26  required a limiting construction to protect First Amendment interests, but it also noted

27  that *Gordon* was "correct to at least *suspect* non-artistic motives where the junior user

28  uses the mark in the same channels, and in basically the same way, as the senior

user." (*See Stouffer v. Nat'l Geographic Partners, et. al.,* 400 F. Supp. 3d 1161, 1179 (D. Colo. 2019) (emphasis in original)).  That Court, relying upon and referring to *Gordon* and a Sixth Circuit case, *Parks v LaFace Records*, 329 F. 3d 437 (6th Cir. 2003), stated that both cases were examples of courts "struggling to assimilate unanticipated factual patterns into the *Rogers* test—[ones] that raise legitimate concerns about whether Rogers tilts too far in favor of the junior user's First Amendment interests." (*See Stouffer*, 400 F. Supp. 3d. at 1173-74, 1176-77 & 1178-79 (D. Colo. 2019)).

In following and relying upon the *ratio* in *Gordon*, the *Stouffer* Court declared that the key question was whether the junior user had a "genuine artistic motive" for using the mark.  The answer, the Court noted, requires a determination of the junior user's motives, using a series of questions including:  (1) whether the senior and junior users use the mark to identify the same kind, or a similar kind, of goods or services, (2) what extent the junior user 'added his or her own expressive content to the work beyond the mark itself,' (3) whether the timing of the junior user's use suggests a motive to capitalize on popularity of the senior user's mark, (4) the way in which the mark is artistically related to the underlying work, service, or product, (5) whether the junior user made public statements or engaged in any conduct known to the public suggesting a non-artistic motive, and (6) whether the junior user made any private statement or engaged in any private conduct suggesting a non-artistic motive.  (*Id.* at 34-36).  Suffice it to say, the analysis is somewhat more demanding than the minimal "artistic relevance" prong in *Rogers*.  And, notably, although artistic relevance is a factor, it does not rise to the level of a  "threshold inquiry."  The logic is persuasive, since the traditional threshold inquiry fails to fully account for artistic choices.  The *Stouffer* Court acknowledged that assessing the artistic motive is subjective, but it could nonetheless safeguard First Amendment interests.

Here, in a limited analysis, the Plaintiff adopts the position that the *Gordon-Stouffer* progeny is applicable, and this Court ought not to be bound by the *Rogers* test

as espoused by the Defendant.  Notably, the Court should consider, among the *Stouffer* factors, that there is really little or no "genuine artistic motive" in Defendant's logo use. To whatever extent the same might be characterized as such, the Defendant's First Amendment considerations are insufficient to outweigh the Plaintiffs Trademark related claim.   The Plaintiffs use the mark to enhance their brand and associate services with professionalism and a worldwide reputation as leaders in the offshore company formation industry.  On the other hand, **NETFLIX** uses the mark to lend some reality to their false message that Plaintiffs are criminals and, in the process, it stains the logo and associates it with senior users in an unsavory way.  The movie and the trailer come at a time when the Plaintiffs are attempting to resolve and demonstrate their innocence in criminal cases/investigations both in Panama and the United States.  At a minimum, the Defendant was aware of the Panama cases.  The timing is significant.  Clearly, the only reason to use the logo is to capitalize financially;  the mark is deployed to give the movie an aspect of reality in connection with false and defamatory statements it makes about the Plaintiffs being involved in criminal activity.  This effort is geared toward attracting viewers to the prospect of learning about offshore culture and crimes based upon a true story ("based on some real shit") versus a simply fictional tale. The problem is that the story that unfolds contains a false message about the Plaintiffs, and the artistic value in Defendant's use of the logo is miniscule.  Clearly, the message of the movie, albeit defamatory toward the Plaintiffs, would not be affected by leaving the logo out of the scenes in which it appears.

To the extent that *Gordon* and its explanation in *Stouffer* are properly considered by this Court, a decision as to the validity of Plaintiffs' Lanham Act False Advertising claims cannot be made as a matter of law, and should not be disposed of in the context of a summary motion.  Likewise, even under a *Rogers* analysis alone, this Court should deny the Defendant's motion at this summary stage.  For these reasons, and others that would further clarify after discovery, the Defendant's First Amendment position must fail.

**III.   CONCLUSION**

Plaintiffs have adequately pled their Fourth and Fifth Counts.  Defendant's motion pursuant to FRCP 12(c) should be denied, or in the alternative, stayed pending further discovery pursuant to this Court's order, and to whatever extent required and/or necessary, the Court should afford the Plaintiff an opportunity to amend its pleadings at this early stage.

DATED: July 12, 2020           Law Offices of Richard G. Novak


By:   */s/ Richard G. Novak*

RICHARD G. NOVAK
Attorneys for Plaintiffs
MOSSACK FONSECA CO., S.A.,
BUFFET MF & CO; JÜRGEN
MOSSACK; RAMÓN FONSECA


DATED: July 12, 2020           Law Offices Stephen J. Carriero


By:  */s/ Stephan Seeger*

STEPHAN SEEGER
Attorneys for Plaintiffs
MOSSACK FONSECA CO., S.A.,
BUFFET MF & CO; JÜRGEN
MOSSACK; RAMÓN FONSECA